## HEADY v. COMMISSIONER OF INTERNAL REVENUE.

## UNION TRUST CO. OF INDIANAPOLIS v. SAME.

### Nos. 9029, 9030.

Circuit Court of Appeals, Seventh Circuit.
June 23, 1947.

C. Severin Buschmann, John A. Alexander, and William H. Krieg, all of Indianapolis, Ind., for petitioners.

Douglas W. McGregor, Asst. Atty. Gen., Sewall Key, J. Louis Monarch, and Helen Goodner, Assts. to Atty. Gen., and J. P. Wenchel, of Washington, D. C., for respondent.

Before SPARKS and KERNER, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

These petitions to review decisions of the Tax Court present the question whether the taxpayers who held all the stock of the Ready Mixed Concrete Corporation received income during the year 1939, either in the form of capital gain or dividends, from the distribution to them of debentures of the corporation. Petitioners contend that the debentures were distributed as part of the recapitalization of the corporation for a corporate business purpose, and are accordingly exempt from income tax under the provisions of section 112(b) and (g) of the Internal Revenue Code, 26 U.S. C.A. Int.Rev.Code, § 112(b, g).

The facts were for the most part stipulated. The corporation involved was engaged in the business of manufacturing and selling mixed concrete. It had been organized in 1931 by Harvey Tutewiler, a very successful business man, and its success had been largely due to his activities. 888 shares of its 1000 shares of no-par value stock were owned by him, and the remaining 112, by petitioner, Mrs. Heady.

Tutewiler was killed in an automobile accident in December, 1938, and petitioner, the Union Trust Company, became executor of his estate and trustee of a trust set up pursuant to the terms of his will. This will provided that his executor should sell all his interest in the corporation as promptly after his death as a purchaser for a fair consideration could be found, for cash or on terms satisfactory to the executor and his wife or daughter. He specifically enjoined the executor not to operate the business for any greater length of time after his death than was absolutely necessary.

In accordance with these directions the executor was ordered by the court to offer the 888 shares in his estate for sale for cash at not less than the full appraised value ($245 a share). In response to the published notices of sale, numerous offers were received, but all were unsatisfactory, the highest being for $88,800 for the 888 shares belonging to the estate, and $11,200 for Mrs. Heady's. The court thereupon terminated the authority to sell and directed that the executor hold the stock until its further order.

Following the attempts to sell, the executor endeavored to procure satisfactory management for the business. Since the corporation was one which depended primarily on management for its success rather than the actual value of the assets used in the business, it was necessary to find someone with experience and knowledge of the particular problems. Chesleigh Gray was considered to be the best qualified for the position. He was at that time manager of a company from which the corporation purchased all of the sand and gravel used in its operations. He had had considerable experience in the management and use of the kind of concrete produced by the corporation and had been a personal and business friend of Tutewiler for many years, having been somewhat responsible for the latter's decision to organize the corporation, and having advised him as to the arrangement of the plant. He was thoroughly familiar with the problems involved in the business which was closely related to the one in which he was then engaged, and he knew the clientele with which Tutewiler had done business. However, when he was asked to take over the management, he refused to consider it on a salary and bonus basis, being unwilling to leave his position unless he could acquire ownership of the corporation in the event that his management proved successful. He was not financially able to purchase it, however, and the stockholders were unwilling to enter into any arrangement contemplating the sale of the stock unless they could retain control over the corporation until the fair value was realized.

Under these circumstances, and motivated by the desire of the stockholders to obtain the services of Gray as manager, and at the same time realize the fair value of their stock, the parties worked out a plan involving the recapitalization here involved, and a contract of employment for Gray with a provision for the purchase by him of blocks of the stock from time to time.

The recapitalization consisted of the issuance of 1000 shares of new capital stock having a par value of one dollar a share, and $135,000 in 7% debentures maturing serially from five to twelve years after June 1, 1939, the new stock and debentures to be exchanged for the 1000 shares of the

old no-par value stock. The contract provided for salary and bonus for Gray and gave him the option to buy blocks of stock at specified prices as fixed amounts of the debentures were retired.[1] It also obligated him to devote all his income from the corporation in excess of the amount of his actual salary, whether from bonus or dividends, first to the purchase of the blocks of stock then available under the schedule, or, if none, then to lend it to the corporation for 1½% interest for the retirement of additional debentures. The contract was terminable on various conditions, including the death of Gray or termination of his employment by the corporation, and in the event of such termination before Gray had bought 475 shares of the stock, petitioners were granted an option to repurchase the stock theretofore bought under the contract, for $150 a share.

The plan was put into effect; petitioners received the new stock and the $135,000 debentures, which were found to have a fair market value of $120,000, in exchange for their old no-par value stock; Gray was employed as manager of the corporation.

According to the corporate books, prior to the recapitalization, the surplus amounted to $103,006, and net earnings for the first five months of 1939 were $37,325. The $103,006 surplus was extinguished on the books after the exchange. Under the contract, Gray could not purchase the last 525 shares—enough to give him control of the corporation—until the debentures had been reduced to $12,500. Thus as the Tax Court found, "the petitioners were assured that they, as stockholders, would receive the amount of the accumulated surplus and earnings existing on June 7, 1939, prior to the acquisition by Gray of the controlling interest in the corporation's stock."

The Tax Court found from these facts that, "The purpose of the exchange of stock of the corporation for stock and debentures was to segregate the accumulated corporate earnings and to make certain that petitioners, as stockholders, would receive them. No corporate business purpose for the transaction has been shown." It accordingly ruled that petitioners realized taxable income from the distribution of the debentures, and that such income was taxable as a dividend or its equivalent rather than as capital gain. Petitioners contend that this finding is contrary to the evidence, which, they argue, clearly shows a corporate business purpose, the engaging of Gray's services as manager, hence they assert error in the ruling of the court that they received taxable income from the exchange.

Section 112(b) (3) provides that no gain or loss shall be recognized upon an exchange of stock for stock or securities in the same corporation pursuant to a plan of reorganization, and section 112(g) (1) (E) provides that a recapitalization of a corporation is a statutory reorganization. In discussing these two provisions, the Tax Court stated that the readjustment of the capital structure here involved and the exchanges made by the petitioners constituted a literal compliance with them, but that since the decision in Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed 596, 97 A.L.R. 1355, in order for a taxpayer to secure the benefits of the reorganization provision it must appear that the reorganization had as its objective a legitimate business purpose, and that that purpose must be germane to the business of the corporation.

Petitioners contend that the Tax Court has unduly extended the scope of the Gregory decision which was never intended to cover such a situation as is here present, but was directed only to the case where the so-called reorganization was a sham executed only for the purpose of escaping a tax liability, and that a reorganization by way

---

[1] Col. I of the schedule below shows the number of shares which might be purchased when the outstanding debentures had been reduced to the amounts shown in Col. III, and Col. II shows the amount per share which was to be paid.

| Col. I | Col. II | Col. III |
|---|---|---|
| 50 | $200.00 | $117,500 |
| 50 | 200.00 | 100,000 |
| 75 | 200.00 | 82,500 |
| 100 | 150.00 | 65,000 |
| 100 | 150.00 | 47,500 |
| 100 | 150.00 | 30,000 |
| 525 | 73.50 | 12,500 |

of recapitalization may have as its primary objective the business interests of its shareholders if unrelated to tax avoidance—that no necessity exists to show a *corporate* business purpose separate and distinct from the shareholders' business interests. We think this analysis wrongly emphasizes the *motive* of the transaction rather than the ultimate effect of it. It.is quite true that there was nothing illegitimate about the arrangement here entered into. We note, however, that according to the testimony of two witnesses, the particular plan chosen was thought to be tax free and was worked out with that thought in mind.

As we view the facts, a purchaser willing and able to pay the $245 a share value of the stock (which reflected the accumulated earnings and profits) could not be found. Rather than accept the $100 offered, which did not properly reflect the actual value of the stock, another means was devised for transferring to the stockholders the equivalent of the fund accumulated as surplus.during the period of their ownership, while at the same time receiving the benefits of good management. This plan consisted of a series of steps calculated to enable Gray to swing the purchase of the corporate stock, and, at the same time to enable the stockholders to realize the accrued profits of the business at that time tied up as surplus. The effect of this was to siphon off that part of the book value of the shares attributable to profits and earnings accumulated after February 28, 1913, thereby effecting a distribution of those earnings and profits. That this distribution took the form of a recapitalization does not alter its effect nor its consequencecs under the Revenue Act, section 115, 26 U.S.C.A. Int. Rev.Code, § 115, of which treats as a taxable dividend any distribution of earnings or profits accumulated after February 28, 1913, and defines dividend as any distribution made by a corporation to its shareholders, "whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913 * * *."

A very similar question was presented to the Court of Appeals for the Third Circuit in two cases recently decided by that court. See Bazley v. Commissioner, 155 F.2d 237, and Adams v. Commissioner, 155 F.2d 246, affirmed by the Supreme Court, June 16, 67 S.Ct. 1489. In both of those cases the court emphasized the effect of the distributions rather than the motives and plans of the taxpayers and their corporations, holding in the Bazley case [155 F.2d 241], that, "the net effect of the distribution of the debenture bonds was to distribute to the petitioner a substantial segment of the previous earnings of the corporation." The court further held that the petitioners were not entitled to the benefits of the reorganization exemption, referring to the legislative history of the section to show that it had been retained in the Revenue Act only in order to permit legitimate reorganizations required in order to strengthen the financial condition of the corporation, but to be strictly limited to such readjustments as were required by business exigencies and undertaken for reasons germane to the continuance of the business of a corporation a party to the reorganization. The court called attention to the fact that, as in the case at bar, the Tax Court found nothing in the calling in of the old common stock, issuance and distribution of new common stock, and issuance and distribution of debenture bonds which was required to strengthen the financial condition of the corporation. "Congress obviously did not intend to grant a tax exemption in such a situation merely because, qua corporate accounting, there was a 'recapitalization' and thus a 'reorganization' * * *. Clearly, a reversal of the Tax Court's holding would permit the use of the Section 112 exemption as a device for evading taxes Congress intended to impose under Section 115 * * *. In its last analysis, the 'recapitalization-reorganization' here under consideration accomplished nothing other than a distribution to the Bazleys and Day which consumed a large portion of the corporation's earned surplus otherwise available for the subsequent declaration of dividends. This result was one which, whatever the motives of the Bazleys may have been, cannot have the effect desired by the recipients of freedom from tax liability."

The Supreme Court [67 S.Ct. 1492], in affirming said, "A 'reorganization' which

is merely a vehicle, however elaborate or elegant, for conveying earnings from accumulations to the stockholders is not a reorganization under § 112." This language is equally applicable to the facts of the case at bar.

Decision affirmed.