CARL G. ORTMAYER AND HILDA B. ORTMAYER, HUSBAND AND WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 53272. Filed April 17, 1957.

*Donald P. Zedler, Esq.*, for the petitioners.
*J. Bruce Donaldson, Esq.*, for the respondent.

FISHER, *Judge:* This proceeding involves deficiencies in income taxes determined against Carl G. and Hilda B. Ortmayer as follows:

| Year | Deficiency |
|------|-----------|
| 1948 | $37,921.32 |
| 1949 | 441.22 |

By amended answer, respondent claims an increased deficiency for the year 1948 in the amount of $13,031.42. The material part of the claim is set forth in the margin.[1] The respondent, in said amended answer,

[1] By amended answer, respondent made the following claim for increased deficiencies:

8. On July 2, 1948 the following transaction occurred between Carl G. Ortmayer and Cunningham-Ortmayer Company. Carl G. Ortmayer, on his part (1) surrendered his right to salary due from Cunningham-Ortmayer Company in the amount of $11,100.00, (2) transferred to Cunningham-Ortmayer Company 643 of the Company's debenture obligations having a face value and a fair market value of $100.00 each. Cunningham-Ortmayer Company, on its part cancelled outstanding indebtedness in the amount of $95,561.52 owing to the Company by Carl G. Ortmayer.

9. In the event this Court holds that the respondent has correctly determined that the distribution of the 748 debentures by Cunningham-Ortmayer Company to the petitioners herein on July 2, 1948, was a distribution essentially equivalent to a dividend within the meaning of section 115(g) of the Internal Revenue Code of 1939, then the respondent makes claim for increased deficiency in the amount of $13,031.42 under section 272(e) by reason of the facts set forth in paragraph 8, *supra*. In particular the respondent maintains that the difference between Carl G. Ortmayer's cost basis for the salary and debentures sur-

also sets forth an alternative claim for increased deficiency in the amount of $450.72 for the year 1948 which it is unnecessary to set forth herein in the light of our determination.

The issues to be decided are: (1) Does the transaction whereby the Cunningham-Ortmayer Company issued pro rata new stock and debentures in exchange for the surrender of its old stock, plus $1 per share so surrendered, qualify under section 112 (g) (1) (E) and (b) (3) of the 1939 Code as a nontaxable reorganization, or does all or a part of it constitute a distribution taxable as a dividend within the purview of sections 22 (a), 115 (a), and 115 (g) of the 1939 Code; (2) did the cancellation by the Cunningham-Ortmayer Company of the outstanding indebtedness owed by Carl G. Ortmayer to it, in exchange for petitioner's surrender to the company of certain of its debentures plus his cancellation of salary amounts owed him by the company, result in his realization of income measured by the excess of the canceled indebtedness over the surrendered debentures and salary; (3) were certain advances by petitioner to the company contributions to capital or loans; and (4) are the premiums paid by petitioner, Carl G. Ortmayer, on certain life insurance policies deductible as alimony under section 23 (u), 1939 Code?

### FINDINGS OF FACT.

Some of the facts are stipulated and are incorporated herein by this reference.

Petitioners Carl G. and Hilda B. Ortmayer are married individuals presently residing at Redlands, Colorado. During the calendar years 1948 and 1949, they resided in Milwaukee, Wisconsin. Petitioners filed timely joint Federal income tax returns for such years with the then collector of internal revenue for the district of Wisconsin.

In 1924, Carl G. Ortmayer (hereinafter referred to as petitioner) and E. J. Cunningham were among those who caused the Cunningham-Ortmayer Company (hereinafter referred to as the company) to be incorporated in the State of Wisconsin. Since that time it has been engaged in the distribution and sale of road-building equipment and large construction machinery. E. J. Cunningham was the president of the company from the date of its incorporation until his death in 1941. Petitioner has been an officer of the company at all times since its incorporation. Upon the death of E. J. Cunningham in 1941, petitioner became president of the company and remained in that capacity until the year 1952. During the period from 1928 until July 2, 1948, the company had issued stock which consisted of $100-

---

rendered ($75,400.00) and the amount of the total indebtedness cancelled by Cunningham-Ortmayer Company ($95,561.52) constitutes cancellation of indebtedness income taxable to petitioners within the purview of sections 22(a), 115(a) and 115(g) of the Internal Revenue Code of 1939.

par-value common, 750 shares of which were outstanding. From 1928 until the death of E. J. Cunningham in 1941 these shares were held as follows:

|  | Shares |
|---|---|
| E. J. Cunningham | 374 |
| Carl G. Ortmayer | 374 |
| Other stockholders | 2 |
| Total outstanding | 750 |

Petitioner's basis for his 374 shares of stock was $18,204.

During the period from January 1, 1924, until July 2, 1948, the Articles of Organization of the Company contained the following provision:

> In the event that the holder of any common stock without par value desires to dispose of same, he shall first offer the said stock in writing to the said corporation at the then booked value. of the said stock; said offer in writing must be sufficient to give the corporation at least ten days notice of the intention of said stockholder to dispose of the said stock.

During the period from January 1, 1924, to and including March 15, 1947, all certificates of common stock issued by the company contained a written notice of said restrictions as to the transfer of shares and the first offer rights of the company.

Upon the death of E. J. Cunningham in 1941, his 374 shares of stock in the company passed to Ben A. Froeming (hereinafter referred to as Froeming) as a creditor. Froeming continued to hold said shares until his death in 1945. Froeming was, until his death, a substantial creditor of the company. Petitioner entered into an agreement with Froeming's estate to purchase the 374 shares for the sum of $30,000 of which $10,000 was to constitute a downpayment and the balance to be paid at the rate of $2,000 per month. Petitioner borrowed the purchase price of the stock from the company. As evidence of his borrowings, at various times during 1945 and 1946, he executed and delivered to the company 11 non-interest-bearing promissory notes (1 for $10,000 and 10 for $2,000) which were payable upon demand. The company issued its checks for each payment as it became due. The receipt signed by the executors of Froeming's estate, dated October 4, 1946, shows that the check was made payable to petitioner, who endorsed it to the order of the said executors. The remaining receipts are in substantially the following language: "Received from C. G. Ortmayer (* * * Dollars) represented by check #* * * of Cunningham-Ortmayer Company." On the books and records of the company, the transaction was recorded in an asset account as follows: "Stockholders' Loans * * * $30,000.00." Said asset account at various times also bore the designation "Officers and Employees Notes and Accounts Receivable." Petitioner made no re-

payment or partial repayment of this indebtedness to the company prior to July 3, 1948.

No formal assignment to petitioner appears on the stock certificate formerly owned by Froeming, but the transfer of his shares to petitioner was recorded in the stock record book of the company, and a new certificate was issued in petitioner's name covering Froeming's shares together with shares previously owned by petitioner. Petitioner signed a receipt for the new certificate. A copy of a statement of assets and liabilities which was filed with the Bureau of Internal Revenue in December 1947, listing petitioner's assets and liabilities for years 1940 through 1946, clearly indicates that petitioner listed the $30,000 notes to the company as a liability, and included the stock acquired from the Froeming estate among his assets. As will appear *infra*, petitioner, in 1952, paid over to the company $30,000 in cash (the amount of the proceeds of the sale of 374 shares of class A stock) and transferred to the company 748 shares of class B stock. He did not, however, return to the company the debentures attributable to the ownership of the Froeming stock in the July 2, 1948, transaction.

Petitioner bought the Froeming shares for himself, and not as trustee for the company, and he owned them at the time of the transactions of July 2, 1948.

During the years 1930 to 1932, inclusive, petitioner made a succession of advances to the company, aggregating $68,196.62, out of his own personal assets. No promissory notes or evidence of indebtedness was given by the company for the sums advanced and no interest was payable on these sums. The minute book of the company contains a succession of stockholders' resolutions to the effect that each of said advances should constitute "Capital Loans" and that they were "to be paid * * * out of future earnings when and as such funds are available." These various advances were entered on the company's accounting records as additions to Donated Surplus. On January 3, 1933, an entry was made in the company's Private Journal transferring the amount of $68,196.82 from the Donated Surplus account to an account entitled "Capital Stock Loans." This entry was accompanied by the following explanation: "To correct Donated Surplus Account and to properly record Capital loans as authorized by the stockholders today." During the period from 1934 to 1944, inclusive, petitioner made various withdrawals from the company which were recorded on its books as accounts receivable. Periodically, the balances of such accounts receivable were charged against the Capital Stock Loans account, reducing the balance in this account to $20,851.76 by December 31, 1944. This balance remained the same on July 2, 1948. Petitioner testified that he understood the advances which he had made to the company were to be repaid when and if the company

was able and that any obligation of the company to repay was subordinate to the rights of the other corporate creditors. In the Federal income tax returns filed by the company for the years 1944 to 1948, inclusive, the advances by petitioner are shown as paid-in surplus. Petitioner, as president of the company, signed these returns.

A protest was filed by the company regarding certain adjustments to its income and excess profits tax liability for the years 1943 to 1945, inclusive. A portion of this protest reads as follows:

We also take issue with several of the adjustments which the Revenue Agent made on the company's balance sheets for the years 1939 through 1945, which resulted in a considerable reduction in the amount of the excess profits credit available to the company on the invested capital method. For 1939, and similarly for subsequent years, the agent reduced the paid in surplus by a considerable amount and made a corresponding adjustment to accounts payable. He explained in Exhibit A–1, Item (c), that the adjustment to accounts payable was "to set up accounts payable of officers which had been included in paid in surplus" and in Item (g) that the adjustment to paid in surplus was to "correct" it.

As before indicated, the corporation was in poor financial condition for a considerable period. During this time its principal stockholders, primarily Mr. O. G. Ortmayer, invested additional funds in the corporation which were intended as capital contributions and not as loans. These funds were treated as part of the capital of the corporation and reflected as paid in surplus on the corporation's balance sheets. No notes were issued by the corporation to indicate that there was any indebtedness owing by it to Mr. Ortmayer. There was no agreement for the payment of interest and in all other respects the sums were treated as additional capital rather than as loans. On its balance sheet, which reflected the corporation's understanding of the treatment of these sums of money and the effect upon its capital structure, they were included as a capital item rather than as an account payable. Although the amounts involved were entered in the books in an account called "Capital Stock Loan Account," the designation is ambiguous and would have to be explained in the light of the taxpayer's understanding of the effect of this account upon its capital structure. The fact is that the taxpayer understood and treated this account as the equivalent of paid in surplus and not as an account payable.

For the foregoing reasons, the Revenue Agent erred in adjusting the balance sheet by reducing paid in surplus and increasing accounts payable.

Petitioner read this protest before he signed it as president of the company.

We find as an ultimate fact that the advances in question were contributions to capital, and not loans to the company.

In each of the calendar years 1946, 1947, and 1948, petitioner was authorized to draw a salary of $30,000 per annum as president of the company. At various times during said years, petitioner borrowed from the company, and such borrowings were recorded in an asset account entitled "Officers and Employees Notes and Accounts Receivable." The balances shown in said asset account fluctuated greatly during this period because of partial repayments and intermittent additional borrowing. On July 2, 1948, petitioner was indebted to

the company in the amount of $95,561.52, consisting of accounts payable of $65,561.52 and notes payable of $30,000. On that same date petitioner had accrued unpaid salary due from the company of $11,100.

During the years 1924 to 1930, inclusive, the company earned a net profit of $1,434. During the period from 1931 to 1948, inclusive, the company's accrued profits and losses were as follows:

| Year | Profit | Loss | Year | Profit | Loss |
|------|--------|------|------|--------|------|
| 1931 | $9, 757 | | 1940 | | $6, 330 |
| 1932 | | $9, 128 | 1941 | | 41, 644 |
| 1933 | | 2, 991 | 1942 | $26, 000. 00 | |
| 1934 | | 12, 765 | 1943 | 25, 601. 00 | |
| 1935 | | 18, 066 | 1944 | 16, 830. 00 | |
| 1936 | 2, 793 | | 1945 | 19, 628. 00 | |
| 1937 | 6, 700 | | 1946 | 118, 549. 03 | |
| 1938 | | 3, 215 | 1947 | 92, 953. 39 | |
| 1939 | 483 | | 1948 | 102, 199. 58 | |

In 1928, the company reorganized and issued a nontaxable stock dividend. During the period from 1924 to July 1948, no taxable dividend was declared or paid by the company.

Because of the nature and high cost of its inventory items, the company required a substantial line of credit. The Marine National Exchange Bank of Milwaukee, Wisconsin, had for a period of years been extending it a line of credit of $100,000. These loans were secured by an assignment of the company's current accounts receivable. As a part of maintaining this line of credit the company periodically submitted financial statements to the bank. Upon receipt of the current statement, in the spring of 1948, the bank expressed concern that current earnings of the business were being loaned to petitioner rather than being retained to build up working capital. The bank did not request the elimination of petitioner's indebtedness to the company or suggest a recapitalization. The bank did insist that, in the future, there should be no further borrowing by officers or employees.

The company consulted its accountant about the foregoing situation. Thereafter, on June, 30, 1948, a special meeting of the stockholders was held, at which time it was decided to change the capital stock of the company from 750 shares of $100-par-value common (issued and outstanding) to 1,500 shares of $1-par-value common (authorized) and to issue long-term debentures in an amount not to exceed $99,000. On July 2, 1948, the stockholders surrendered to the company all of its 750 outstanding shares and these $100-par-value common shares were canceled by the company. In addition to surrendering this stock, the stockholders paid over to the company the sum of $1 with each share surrendered, or a total of $750. In exchange for the surrendered $100-par-value shares and the $750 paid in, the company issued, pro rata, 750 shares of $1-par-value common stock and 750 six per cent debentures. The debentures were

in the face amount of $100, were for a 10-year term, and were redeemable on an interest-paying date at the option of the company. One debenture was issued and delivered with each share of $1-par-value common stock. The following schedule shows the effect of the exchange on each stockholder of the company:

| Stockholder | Shares of $100-par common stock surrendered | Amount paid over to company | Shares of $1-par common stock received | Number of $100 ten-year debentures received | Face amount debentures received |
|---|---|---|---|---|---|
| Carl G. Ortmayer | 598 | $598 | 598 | 598 | $59,800 |
| Hilda B. Ortmayer [1] | 150 | 150 | 150 | 150 | 15,000 |
| Other stockholders | 2 | 2 | 2 | 2 | 200 |

[1] Petitioner had transferred to his wife, on March 15, 1947, 150 of the 374 shares which he had held since 1928. After the exchange of stock for stock and debentures by the company, on July 2, 1948, Hilda B. Ortmayer transferred to petitioner 45 of the debentures which she had received. In return, petitioner executed a promissory note in the amount of $4,500 and delivered it to Hilda B. Ortmayer.

On July 2, 1948, the fair market value of each share of $1-par-value common stock distributed by the company was $350 and the fair market value of each of its debentures was $100.

On July 2, 1948 (subsequent to the distribution of the debentures), the company canceled all the outstanding indebtedness due it from Carl G. Ortmayer ($95,561.52, as elsewhere described in these findings). In return, petitioner (1) surrendered his right to salary due of $11,100; (2) transferred to the company 643 of its outstanding $100 face amount debentures; and (3) agreed to the company's canceling the $20,851.76 balance which was credited to him in the capital loan account on the company's books as the result of the advances which he made to it during the 1930's.

The interest expense created by the issuance of debentures in 1948 was small, being about $600 per annum. The transaction did not better the financial position of the company for credit purposes. The bank continued the $100,000 line of credit after the transaction; but subsequent to the transaction, it required the assignment of accounts receivable which were obligations of municipalities as security for the line of credit, and would not extend credit on assignment of accounts of individuals and corporations. Prior to that time, it had been its practice to accept assignment of all types of accounts receivable.

On December 30, 1950, an annual meeting of the stockholders of Cunningham-Ortmayer Company was held. Pursuant to a resolution adopted at said meeting, Cunningham-Ortmayer Company issued a stock dividend. The 750 shares of $1 par value previously outstanding were denominated class A common and 1,500 shares of $100-par-value common were authorized and denominated as class B (nonvoting) common. The company distributed as a stock dividend 2 shares of class B (nonvoting) common for each share of class A

common owned. After this stock dividend, the stock of Cunningham-Ortmayer Company was held as follows:

| Stockholder | Class A common | Class B common |
|---|---|---|
| Carl B. Ortmayer | 598 | 1,196 |
| Hilda B. Ortmayer | 150 | 300 |
| Other stockholders | 2 | 4 |

On January 15, 1952, petitioner sold to Adams and his wife 374 shares of class A common stock for $30,000. Thereafter, during April 1952, petitioner turned over to the company 748 shares of its class B common stock pursuant to an offer which he had made and the company accepted. On September 29, 1952, petitioner turned over to the company an amount equal to the aforesaid class A stock sales proceeds ($30,000) in accordance with the April offer accepted by the company. On that same day, petitioner and his wife sold to the company all of their remaining stock and securities therein (374 shares class A common, 748 shares class B common, and 105 debentures) plus other unidentified assets for some $275,000.

In relation to the transactions of July 2, 1948, we find the following ultimate facts:

(1) The pro rata distribution on July 2, 1948, by Cunningham-Ortmayer Company of new stock and debentures in exchange for the surrender of its old stock, which old stock was thereupon canceled, was at such time and in such manner as to make such distribution and cancellation essentially equivalent to the distribution to petitioners of a taxable dividend to the extent of $74,052, representing the fair market value of the debentures distributed to them ($74,800) less cash in the amount of $748 which petitioners paid to the company as part of the transaction.

(2) The cancellation on July 2, 1948, by Cunningham-Ortmayer Company of the indebtedness of Carl G. Ortmayer resulted in income to him in the amount of the excess of the indebtedness over the salary credit and the basis of the debentures surrendered by him—viz, $20,161.52.

In September 1942, Carl G. Ortmayer and his former wife, Emily K. Ortmayer, were divorced pursuant to a decree of absolute divorce rendered by the Circuit Court of Marinette County, Wisconsin. The decree of divorce provided fixed alimony and support payments for the divorced wife and children of the marriage. In addition, the decree specified as follows:

9. That the husband shall pay the premiums on the insurance policies now carried on the life of the husband in the sum of Fifty Thousand Dollars when they become due, and the husband will not permit the policies to lapse. The husband shall not have the right to change the beneficiary of such policies except upon the death of the wife, in which event the surviving daughters of the parties,

and the issue of any deceased daughter, shall be named as beneficiaries, the issue of any deceased daughter to take per stirpes and not per capita. The husband shall execute such documents as may be necessary with the insurance companies which issued the insurance policies in order to effectuate the provisions of this paragraph.

The following are the policies hereinbefore referred to:

Metropolitan Life Insurance Policy No. 9396703, $15,000.00, Policy No. 9500556, $15,000.00

Wisconsin National Life Insurance policy No. 96058, $10,000.00, Policy No. 95772, $10,000.00

In accordance with the provisions of the aforedescribed divorce decree, Carl G. Ortmayer caused to be included in the insurance policies specified the following provision:

Pursuant to the conditions of policy [number], I hereby revoke any previous designation of a beneficiary (or beneficiaries) made by me, and, in lieu thereof, as principal beneficiary (or beneficiaries) I hereby irrevocably designate my divorced wife, Emily K. Ortmayer, while living, and I hereby irrevocably designate my daughters, Dorothea Marie Ortmayer, Susan Jane Ortmayer, and Mary Lou Ortmayer, or survivors or survivor, as contingent beneficiaries, to whom the net sum available at the time of the approval of the proofs of my death shall be paid if said Emily K. Ortmayer is not then living.

In October 1944, Carl G. Ortmayer substituted for Metropolitan Life Insurance Company Policies Nos. 9396703 and 9500556, a Wisconsin Life Insurance Company Policy No. 116012 in the face amount of $30,000. Said Metropolitan Life Insurance policies were term insurance; said Wisconsin Life Insurance policy was an ordinary life insurance policy not subject to termination by the insurer. The provision set forth *supra*, was included in the substituted policy.

The decree of divorce was not amended to permit any substitution. Emily K. Ortmayer was not apprised of, and did not consent to the foregoing substitution of the Wisconsin Life Insurance policy for the two policies written by Metropolitan Life Insurance Company before it had been accomplished by the petitioner. On September 13, 1945, her attorneys wrote a letter to petitioner which stated *inter alia:*

We have learned from the Metropolitan Life Insurance Company under date of September 5, 1945, that the two policies of insurance which you carried with such company, namely Policy No. 9–396–703 A, expired as of October 19, 1944, and Policy 9–500–556–A, expired as of December 8, 1944. It is our understanding that you were to maintain and keep in effect two $15,000.00 policies and not permit them to lapse. Under the circumstances it is going to be necessary for us to demand that you reinstate those policies and substitute them with policies of like value, naming Mrs. Ortmayer as beneficiary.

There may be some explanation for your action in this regard, and we will be glad to hear from you.

Petitioner replied to this letter to explain the circumstances underlying the substitution (viz, that he feared he would be unable to ac-

quire term insurance after age 65 and wanted to assure that $30,000 of life insurance would continue to be maintained pursuant to the divorce decree). Thereafter he received no further communication from his wife's attorneys in that regard. Carl G. Ortmayer has at all times maintained directly, or through his attorneys, possession of the policies of insurance. No assignment of any of the policies has ever been made by Carl G. Ortmayer.

Carl G. Ortmayer, during the year 1948, paid premiums on Wisconsin National Life Insurance Company Policies No. 96058 and No. 95772, and Wisconsin Life Insurance Company Policy No. 116012 in the amount of $2,302.80. In 1949 he paid as premiums the same amount on the same policies. At the time of said divorce, Carl G. Ortmayer was 52 years of age.

### OPINION.

The first question which must be decided is whether the issuance by the company on July 2, 1948, of 750 shares of $1-par-value common stock and 750 ten-year 6 per cent debentures, in the face amount of $100 each, in exchange for the surrender by its stockholders of the 750 outstanding $100-par-value shares, and the payment of $1 for each share surrendered, constituted a taxable or a tax-free transaction. Petitioners contend that the transaction constituted a recapitalization-reorganization within the definition of section 112 (g) (1) (E), 1939 Code, and that the exchange of stock for stocks and debentures is nontaxable under section 112 (b) (3). Respondent has determined that the distribution of the debentures to the petitioners constituted a distribution essentially equivalent to a dividend taxable to the petitioners under sections 22 (a), 115 (a), and 115 (g) of the Code.

We think that this case falls squarely within the ambit of *Bazley* v. *Commissioner*, 331 U. S. 737 (1947), and *Adams* v. *Commissioner*, 331 U. S. 737 (1947); rehearing denied in both and opinion amended 332 U. S. 752. See also *Heady* v. *Commissioner*, 162 F. 2d 699 (C. A. 7, 1947), affirming a Memorandum Opinion of this Court. The rule governing the instant situation is aptly stated by the Supreme Court in *Bazley* v. *Commissioner, supra,* at 741, as follows:

Since a recapitalization within the scope of section 112 is an aspect of reorganization, nothing can be a recapitalization for this purpose unless it partakes of those characteristics of a reorganization which underlie the purpose of Congress in postponing the tax liability.

No doubt there was a recapitalization of the Bazley corporation in the sense that the symbols that represented its capital were changed, so that the fiscal basis of its operations would appear very differently on its books. But the form of a transaction as reflected by correct corporate accounting opens questions as to the proper application of a taxing statute; it does not close them.

Corporate accounting may represent that correspondence between change in the form of capital structure and essential identity in fact which is of the essence of a transaction relieved from taxation as a reorganization. What is controlling is that a new arrangement intrinsically partake of the elements of reorganization which underlie the Congressional exemption and not merely give the appearance of it to accomplish a distribution of earnings. In the case of a corporation which has undistributed earnings, the creation of new corporate obligations which are transferred to stockholders in relation to their former holdings, so as to produce, for all practical purposes, the same result as a distribution of cash earnings of equivalent value, cannot obtain tax immunity because cast in the form of a recapitalization-reorganization. * * *

The factual situation herein is, in all material respects, identical with the fact patterns in the *Bazley* and *Adams* cases. Here, as there, close corporations were involved (petitioners herein owned 748 out of 750 outstanding shares); the corporations involved issued pro rata new stock and debt obligations in exchange for the surrender of their outstanding stock; substantial earned surplus existed; and the proportionate equity ownership of the corporation remained unchanged. Moreover, in the instant case the corporation had never declared or paid any taxable dividend.

Petitioners contend that the instant transaction is distinguishable from those in *Bazley* and *Adams* by reason of the existence of a valid business purpose. Petitioners argue that said transaction was initiated solely because of the demands of the bank that the company's financial position be improved if it was to continue to receive its customary $100,000 line of credit. The record shows that the instant transaction was preceded by discussions between various officials of the company and the bank. Following these, the company's accountant was called in to discuss the matters raised by the bank, and he devised the transaction involved. However, we are unable to understand how the transaction satisfied the demands of the bank and are convinced, as indicated below, that it was directed at ends other than their satisfaction. The bank was primarily concerned with the continued withdrawals from the company by petitioner and the consequent increasing amounts shown on the company's books as accounts receivable due from petitioner. The bank did not insist upon the elimination of this indebtedness or request a recapitalization. Its principal concern was that there be no additional borrowing of company funds by petitioner or other officers or employees. The series of transactions carried out by the company on July 2, 1948, in no way affected the working capital position of the company. No additional funds accrued to the corporation, except for the nominal $1 per share paid in, and though the financial statement no longer showed what is frequently a rather dubious asset, namely, the accounts receivable due from an officer, it also showed a radically reduced capitalization. At the trial herein, the

vice president of the bank, who was also the loan officer handling the company's loan account, testified that, from the bank's point of view, the transaction did not improve the financial position of the company for credit purposes, and that it was not constructive.

The end result of the transaction, as arranged by the company's accountant, appears to have benefited only petitioner, rather than the company. Petitioner and his wife emerged with an unaffected equity in the company and with debentures having a fair market value of $74,800. No taxable dividends had been distributed by the company during the previous 24 years of its existence. Petitioner made immediate use of the debentures issued by the corporation by returning a portion of them to the company that same day (July 2, 1948) in exchange for the company's cancellation of a substantial indebtedness which he had accumulated by reason of withdrawals in excess of his salary. We fail to see any benefit accruing to the company from the recapitalization since it did not, and apparently was not intended to, improve its working capital position. Cf. *Bona Allen, Jr.*, 41 B. T. A. 206 (1940).

Accordingly, we hold that the company's exchange of debentures and $1-par-value common stock for its formerly outstanding $100-par-value stock does not qualify as a tax-free recapitalization within the meaning of section 112. The transaction must be regarded, with respect to the debentures, as essentially equivalent to the distribution of a dividend, under section 115 (g), and respondent's determination that petitioners received income measured by the excess of the fair market value of the debentures received ($74,800) over the cash paid in ($748) is sustained.

The second issue to be decided involves the transaction which took place between the company and petitioner immediately after their exchange of stock for stock and debentures. In return for the cancellation of all outstanding indebtedness owed by petitioner to the company, petitioner transferred 643 of the $100 debentures to the company, surrendered his right to $11,100 in salary due him, and agreed to the cancellation of the $20,851.76 balance shown on the company's books as capital loans (resulting from the advances which he had made to the company during the early 1930's). By amended answer, respondent claims an increased deficiency with respect to this transaction, arguing that it resulted in income from cancellation of indebtedness in the amount of $20,161.52, computed as follows:

| | | |
|---|---|---:|
| Indebtedness canceled | | $95, 561. 52 |
| Less: Debentures surrendered | $64, 300 | |
| Salary due surrendered | 11, 100 | |
| | | 75, 400. 00 |
| | | 20, 161. 52 |

Petitioner resists the contention of the respondent on two bases: First, petitioner maintains that his indebtedness to the company totaled $65,561.52 rather than $95,561.52. He attributes the difference of $30,000 to one item, namely, the notes payable which petitioner executed and delivered to the company in 1945 and 1946 when he borrowed such amount from the company to acquire 374 shares of stock from the Froeming estate. Petitioner contends that this sum did not constitute a real indebtedness. Secondly, he contends that in addition to the salary ($11,100) and debentures ($64,300 face amount) surrendered, he also canceled an indebtedness due him from the company in the amount of $20,851.76. It is the position of the respondent that no debt existed for the reason that said amount constituted a contribution to capital.

In support of his first contention, petitioner maintains that he was acting as an agent for the company when he took the $30,000 and used it to purchase certain of the company's shares in the hands of the Estate of Ben A. Froeming. In support thereof, petitioner asserts that in 1952 he turned back to the company all that he had received as its fiduciary holder. These assertions have no support in the evidence. There is no record of any agreement existing between the company and petitioner whereby he was to purchase and hold the stock for the company. Our findings of fact demonstrate, to the contrary, that a binding debtor-creditor relationship was intended and established when the funds were loaned and the notes executed and delivered. Moreover, as our findings of fact also reveal, petitioner did not, in 1952, or at any other time return to the company "gratis" all he had received as holder of the 374 shares acquired from the Froeming estate. The 374 six per cent $100 face amount debentures attributable thereto received in the recapitalization on July 2, 1948, were used on that same day as part of the 643 debentures transferred back to the company in return for the agreement to cancel all of petitioner's indebtedness. Accordingly, we reject petitioner's first contention. (Cf. *Woodworth* v. *Commissioner*, 218 F. 2d 719 (C. A. 6, 1955); *Lowenthal* v. *Commissioner*, 169 F. 2d 694, 699–700 (C. A. 7, 1948); *Wall* v. *United States*, 164 F. 2d 462 (C. A. 4, 1957)).

With regard to petitioner's second contention (i. e., that he canceled an indebtedness due him from the company in the amount of $20,851.76), it is clear that no note or evidence of indebtedness was issued, no interest was payable, and no fixed obligation of repayment or any maturity date existed. Early minutes of the company lend some support to the view that the advances might be loans, intended to be repaid, however, only if and when there were earnings available for payment. On the other hand, book entries at one period record such

advances as donated surplus. In 1933, however, a "correcting" entry was made transferring the then amounts of such advances to an account called "Capital Stock Loans." If this were all the evidence before us, the solution of the problem might present difficulty. However, in a protest dated April 4, 1947 (applicable to the years 1943 to 1945, inclusive), filed on behalf of the company, but signed by petitioner as president (much of which is quoted in our findings), petitioner makes the following positive and unequivocal statements:

As before indicated, the corporation was in poor financial condition for a considerable period. During this time its principal stockholders, *primarily Mr. C. G. Ortmayer, invested additional funds* in the corporation which were *intended as capital contributions and not as loans*. These funds *were treated as part of the capital* of the corporation and reflected as *paid in surplus* on the corporation's balance sheets. * * * There was no agreement for the payment of interest and in all other respects the sums were *treated as additional capital rather than as loans. On its balance sheet, which reflected the corporation's understanding of the treatment of these sums of money and the effect upon its capital structure,* they were included as a *capital item rather than as an account payable.* Although the amounts involved were entered in the books in an account called "Capital Stock Loan Account," the designation is ambiguous and would have to be explained in the light of the taxpayer's understanding of the effect of this account upon its capital structure. The *fact is* that the taxpayer *understood and treated* this account as the equivalent of *paid in surplus and not as an account* payable. [Emphasis supplied.]

Moreover, in its Federal income tax returns for the years 1944–1948, inclusive, filed by the company, and signed on its behalf by petitioner as president, the advances by petitioner are shown as paid-in surplus.

Under the circumstances, we must agree with respondent that such advances must be treated as contributions to capital and not as loans. See *R. E. Nelson,* 19 T. C. 575 (1952).

It follows that the excess of petitioner's indebtedness so canceled over the salary credit and basis of debentures surrendered cannot be further reduced by the existing capital contributions. That the excess so canceled (which cancellation was clearly not intended as a gift, cf. *Commissioner* v. *Jacobson,* 336 U. S. 28) constituted taxable income (taxable dividend) to the petitioner under the circumstances before us is apparent. Secs. 22 (a) and 115, 1939 Code; *Jacob M. Kaplan,* 21 T. C. 134, 144–145 (1953), appeal dismissed (C. A. 2, 1954); *J. Natwick,* 36 B. T. A. 866 (1937).

Finally, we must determine whether respondent properly disallowed certain deductions claimed by petitioner as alimony payments under section 23 (u), 1939 Code. All of the material facts are fully set forth in our Findings of Fact. It is our view that the question for decision herein is essentially the same as that decided in our prior holding in *Beulah Weil,* 22 T. C. 612 (1954), affirmed in part (relating to this

issue) and reversed in part (on another issue) on January 22, 1957, by the Court of Appeals for the Second Circuit *sub nom.* *Charles S. Weil* v. *Commissioner*, 240 F. 2d 584. Here, as in *Weil*, although the wife was named as irrevocable beneficiary, she had no right to change the named beneficiaries or assign the policies. Her interest in the policies ceased upon her death during his lifetime, and the children were to be named as beneficiaries in the event she predeceased the husband. Her interest in the policies was thus contingent. For the reasons and upon the authorities cited in *Beulah Weil, supra,* at 619–620 (affirmed as aforesaid), we are of the opinion that the sums applied by petitioner in payment of insurance premiums during the taxable years were not received by his divorced wife, directly or constructively, within the meaning of section 22 (k), 1939 Code, and hence were properly disallowed as deductions claimed under section 23 (u) of the Code.

*Decision will be entered under Rule 50.*