Carl G. ORTMAYER and Hilda B. Ortmayer, Husband and Wife, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 12202.

United States Court of Appeals Seventh Circuit.

April 15, 1959.

Donald P. Zedler, Milwaukee, Wis., for petitioners.

Charles K. Rice, Asst. Atty. Gen., David O. Walter, Atty., Tax Division, U. S. Dept. of Justice, Washington, D. C., Andrew F. Oehmann, Acting Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., for respondent.

Before MAJOR, SCHNACKENBERG and HASTINGS, Circuit Judges.

HASTINGS, Circuit Judge.

This petition for review of a decision of the Tax Court of the United States involves deficiencies of approximately $50,000 assessed against taxpayers, Carl G. and Hilda B. Ortmayer, for the year 1948.[1] It was found by the Tax Court that taxpayers had received taxable income through a distribution of debentures to them by the Cunningham-Ortmayer Company on July 2, 1948 and, further, that Carl G. Ortmayer had received taxable income in a second transaction on the same day in which his debts to that company were canceled.

Taxpayer[2] has been an officer of the Cunningham-Ortmayer Company (the company) since its incorporation in 1924 and was its president from 1941 to 1952. During the years 1946, 1947 and 1948 taxpayer had an annual salary of $30,-000; and, in addition, he borrowed extensively from the company, these borrowings being recorded in an asset account as accounts receivable. The Tax Court found that on July 2, 1948 taxpayer was indebted to the company in the amount of $95,561.52 consisting of accounts payable of $65,561.52 and notes payable of $30,000.[3]

No taxable dividend was declared or paid by the company during the period from its incorporation to the date of the questioned transactions in this case. The company showed a profit during each of the years from 1942 through 1948.

Because of the nature of its business, the company required a substantial line of credit. For a period of years the Marine National Exchange Bank (the bank) had extended it credit of $100,000, the loans being secured by assignment of the company's accounts receivable. The company periodically submitted financial statements to the bank. In the spring of 1948, the bank expressed concern that current earnings of the company were being loaned to taxpayer rather than being retained as working capital. However, the bank neither requested the elimination of taxpayer's indebtedness to the company nor suggested a recapitalization. It did insist that there be no further loans of the company's earnings.

Subsequently, the company consulted its accountant on this matter and on June 30, 1948, at a special meeting of

1. No contention is made by taxpayers in this petition as to a small amount of deficiency found by the Tax Court for 1948 and 1949 relating to amounts originally claimed as deductions for alimony payments.

2. References to taxpayer, singular, are to Carl G. Ortmayer.

3. One of the issues raised in this petition concerns this item of $30,000 which taxpayer contends is no part of his indebtedness to the company. Infra.

stockholders, a decision was made to change the capital stock of the company from 750 shares of $100 par value common stock (issued and outstanding) to 1,500 shares of $1.00 par value common (authorized) and to issue long-term debentures in an amount not to exceed $99,000.

On July 2, 1948 the stockholders surrendered to the company all 750 outstanding shares and these shares were canceled by the company. The stockholders also paid over $1.00 with each share so surrendered and the company thereupon issued, pro rata, 750 shares of $1.00 par value common stock and 750 six percent debentures. The debentures, in the face amount of $100 each, were for a ten-year term and were redeemable on any interest paying date at the option of the company. One such debenture was issued and delivered with each share of $1.00 par value common stock. The taxpayers who had owned 748 of the original 750 outstanding shares of stock thus received 748 of the new shares of stock plus 748 of the debentures. The fair market value of each share of new stock distributed by the company on July 2, 1948 was $350 and that of each debenture was $100.

This transaction did not better the financial position of the company for credit purposes. The bank continued to extend credit but required the assignment of accounts receivable which were the obligations of municipalities as security and would no longer accept, as security, accounts of individuals and corporations.

The Tax Court concluded that the pro rata distribution of the new stock and debentures was essentially equivalent to the distribution of a taxable dividend, within the meaning of Section 115(g) of the Internal Revenue Code of 1939,[4] to the extent that the fair market value of the debentures exceeded the cash amount paid in by taxpayers. Taxpayers urge that the transaction was a nontaxable reorganization-recapitalization as provided in Sections 112(b)(3) and 112(g)(1)(E) of the Code.[5]

We agree with the Tax Court's determination that, as to the purported recapitalization, this case falls squarely within the Supreme Court's holding in Bazley v. Commissioner, 1947, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782. See also Heady v. Commissioner, 7 Cir., 1947, 162 F.2d 699.

█ It is taxpayers' position that the instant case differs materially from Bazley in that the two transactions on July 2, 1948 were undertaken by this closely held corporation for the dominant business purpose of meeting the bank's objections to the then existing indebtedness to the corporation of the taxpayer.[6] This contention must fail on the record in this case. The Tax Court's findings, supported by substantial evidence, indicate that the bank did not request recapitalization by the company; that the bank did not consider the new arrangement to have bettered the financial position of the company for credit purposes; that the transaction did not, in fact, in any way change the working capital position of the company; and that the benefit from the transaction went to the taxpayers who emerged with an unaffected equity in the company and with debentures having a fair market value of $74,800. As stated by the Supreme Court in Bazley: "[W]hether in a particular case a paper recapitalization is no more than an admissible attempt to avoid the consequences of an outright distribution of earnings turns on details of corporate affairs, judgment on which must be left to the Tax Court." Supra 331 U.S. at page 742, 67 S.Ct. at page 1491.

---

4. 26 U.S.C.A. § 115(g) (1939 I.R.C.). Further references to "the Code" will be to the Internal Revenue Code of 1939.

5. 26 U.S.C.A. §§ 112(b) (3), 112(g) (1) (E) (1939 I.R.C.).

6. The taxpayers' position is that the reorganization-recapitalization must be viewed together with the cancellation of taxpayer's debts later on the same day.

But apart from the simple and direct authority of Bazley, the position of the taxpayers is made further untenable by their apparent erroneous assumption that proof of a valid business purpose is *alone* adequate to establish that the distribution was not essentially equivalent to a taxable dividend. This court has held that the existence of a valid corporate purpose is only one of many factors to be considered, and that it is not necessarily the controlling factor. Commissioner of Internal Revenue v. Snite, 7 Cir., 1949, 177 F.2d 819, 823. "[A]ll the factors and all the circumstances should be considered and the net result determined therefrom." Ibid. See also United States v. Fewell, 5 Cir., 1958, 255 F.2d 496, 500; Earle v. Woodlaw, 9 Cir., 1957, 245 F.2d 119, 122; Ferro v. Commissioner, 3 Cir., 1957, 242 F.2d 838, 841, and Jones v. Griffin, 10 Cir., 1954, 216 F.2d 885, 887. It is also well-settled that it is not the motive of the parties but the net effect of the transaction which is relevant. McGuire v. Commissioner, 7 Cir., 1936, 84 F.2d 431, 432, certiorari denied 299 U.S. 591, 7 S.Ct. 118, 81 L.Ed. 435.

Finally, the question of applicability of Section 115(g) is primarily one of fact[7] and, the Tax Court, having considered all the relevant factors and circumstances in determining the net effect of this transaction and its findings being supported by substantial evidence, we cannot say that it was chargeable with clear error in determining the distribution here involved to have been made at such time and in such manner as to make it essentially equivalent to the distribution of a taxable dividend.

In the second transaction on July 2, 1948 the taxpayer had all his debts to the company canceled and, in return, relinquished his right to salary due him of $11,000, transferred to the company 643 of the newly issued debentures (total market value $64,300) and agreed to the company's cancellation of a $20,851.76 balance which was credited to him in the capital loan account on the company's books as a result of advances he had made in the 1930's. Only two items in this transaction are in issue: First, whether notes payable of $30,000 of taxpayer to the company were any part of the indebtedness of taxpayer to the company and, second, whether the $20,851.-76 balance of advances of taxpayer to the company represented loans or contributions to capital.

The $30,000 item represents company funds used by taxpayer to purchase 374 shares of the company's stock which were owned by one Ben A. Froeming when he died in 1945. Taxpayer entered into an agreement with the executors of the Froeming estate to purchase the shares for the $30,000, $10,000 being a down payment and $2,000 to be paid each month for ten months. Commissioner contends, and the Tax Court found that taxpayer *borrowed* the $30,000 to make the purchase. Taxpayer's position is that he bought the stock *as trustee* for the company.

The evidence shows that taxpayer, upon entering into the purchase agreement, executed eleven non-interest bearing notes payable to the company, one for $10,000 and ten for $2,000 each. The company issued its checks as payment became due, these checks being made payable to taxpayer who endorsed them over to the executors of the Froeming estate. The receipts signed by the executors each contained substantially the following language: "Received from C. G. Ortmayer (.............. dollars) represented by check # ............. of Cunningham-Ortmayer Company." The transaction was recorded as a loan to taxpayer on the books of the company. No repayment of the amount was made

---

7. Lowenthal v. Commissioner, 7 Cir., 1948, 169 F.2d 694, 698; United States v. Fewell, 5 Cir., 1958, 255 F.2d 496, 499; Earle v. Woodlaw, 9 Cir., 1957, 245 F. 2d 119, 122, and Ferro v. Commissioner, 3 Cir., 1957, 242 F.2d 838, 840–841. The Court of Appeals for the Second Circuit holds it to be a question of law. Northup v. United States, 2 Cir., 1957, 240 F.2d 304, 307.

to the company either before or on July 2, 1948.

There was no formal entry of assignment to taxpayer on the stock certificate formerly owned by Froeming but the transfer of shares to taxpayer was recorded in the stock record book of the company, and a new certificate was issued to taxpayer covering both the Froeming shares and shares previously owned by taxpayer. Taxpayer signed a receipt for the new certificate. Further, taxpayer listed the shares among his assets and the $30,000 notes payable to the company as a liability on a copy of a statement of assets and liabilities filed with the Internal Revenue Bureau in 1947 covering the years 1940 through 1946. Finally, the shares were a part of the 748 shares taxpayer and his wife turned in to the company on July 2, 1948, and for which they received pro rata the new shares of stock and debentures.

As bearing on taxpayer's contention that he was a trustee for the purchase of the Froeming shares, at a special meeting of the company's stockholders on April 11, 1952, on motion by taxpayer, a resolution was adopted that taxpayer "may and probably was some sort of trustee" for the purchase of the shares of stock, and the company accepted taxpayer's offer to return all proceeds attributable to those shares "without consideration." Pursuant to that agreement taxpayer immediately returned certain shares of stock attributable to the Froeming shares, and, on September 29, 1952, he turned over the proceeds from the sale of other shares likewise attributable to the Froeming shares. On the same day, September 29, 1952, taxpayers sold to the company all their remaining stock and debentures plus other unidentified assets for some $275,000.

We hold that there is more than adequate support in the record for the Tax Court's findings that taxpayer bought the shares of stock for himself and that on July 2, 1948 a debtor-creditor relationship existed between him and the company evidenced by the notes payable of $30,000. The undisputed documentary evidence shows that both the company and taxpayer regarded him as the owner of the stock. This is further strengthened by the fact that he did not return the debentures attributable to the Froeming stock as a trustee but used them as part payment of his personal debts to the company. The belated attempt to convert himself to trustee status lacks weight in view of its timing (coming after there had been examinations of his tax liability for 1948) and in view of its relationship to a concurrent sale of all his remaining stock and securities and that of his wife for a lump sum.

■ Turning to the second item in issue, taxpayer's advances of $20,851.76 to the company, the facts as found by the Tax Court are as follows: During the years 1930 through 1932 taxpayer made a series of advances to the company aggregating $68,196.62. No note or evidence of indebtedness was given by the company for the sums advanced, and no interest was payable on the sums. A succession of stockholders' resolutions contained in the minute book of the company referred to the sums as "capital loans" and indicated that they were "to be paid * * * out of future earnings when and as such funds are available." Initially, these advances were entered on the records of the company as additions to donated surplus, but, on January 3, 1933, an entry in the company's private journal transferred the amount to an account entitled "Capital Stock Loans." This entry was accompanied by the following explanation: "To correct Donated Surplus Account and to properly record Capital Loans as authorized by the stockholders today."

During the years 1934 through 1944 taxpayer had borrowed money from the company. Taxpayer partially repaid such debts by periodically charging them against the Capital Stock Loan Account, thus reducing the balance in that account to the figure of $20,851.76 by December 31, 1944. This balance remained the same on July 2, 1948. Taxpayer testified that he understood that the advances were to be repaid by the company when and if there were earnings available for payment but that his

rights would be subordinate to rights of other corporate creditors. The federal income tax returns filed by the company for the years 1944 through 1948 listed the advances as paid-in surplus contrary to its treatment of them as loans on its books.

The Tax Court's conclusion that the advances made were contributions to capital was based primarily on the weight given by it to a sworn protest filed on behalf of the company in 1947, and signed by the taxpayer here as its president, which urged that the advances were made and treated as paid-in surplus. *The Commissioner at that time had determined the advances to be loans* and had, on the basis of such determination, reduced the company's excess profits credit.

Reliance by the Tax Court on this protest prompted taxpayer's motion for rehearing in the instant case, subsequently denied, which motion submitted as newly discovered evidence the fact that commissioner had rejected the protest and treated the advances as loans, and that a refund suit by the company had followed which resulted in a compromise and dismissal. Taxpayer's contention in this appeal is that the dismissal of the refund suit on its merits now raises the bar of collateral estoppel against commissioner in this case, that the commissioner is also equitably estopped from taking inconsistent positions, and that the Tax Court erred in not permitting introduction of the evidence to show such inconsistency. In view of our disposition of this issue, however, we need not pass on these contentions.

The protest so heavily relied upon by the Tax Court in its determination amounts only to a summary of the company's arguments, rejected by the commissioner, that *the company* at that time, "understood and treated * * * [the capital loan account] as the equivalent of paid-in surplus * * *." These arguments were made in the face of a downward adjustment by commissioner of the company's excess profits credits for the years there involved. The protest is not conclusive here, although it is inconsistent with taxpayer's present position, as are the commissioner's present assertions with his former position as to these advances.

■ The intention of the parties is important in determining the nature of such advances. Maloney v. Spencer, 9 Cir., 1949, 172 F.2d 638, 641. No single test, however, can provide the answer. Arlington Park Jockey Club, Inc. v. Sauber, 7 Cir., 1959, 262 F.2d 902. The courts have stressed, among other factors, the book entries, the debt-equity ratio, the presence of an agreement to maintain proportionality between the advances in question and the acknowledged risk capital, and the expectation of repayment. See Gilbert v. Commissioner, 2 Cir., 1957, 248 F.2d 399, 406; Schnitzer v. Commissioner, 1949, 13 T.C. 43, as affirmed 9 Cir., 1950, 183 F.2d 70.

In passing upon the nature of these advances we are considering an ultimate finding of the Tax Court. As characterized by the Supreme Court in Bogardus v. Commissioner, 1937, 302 U.S. 34, 39, 58 S.Ct. 61, 64, 82 L.Ed. 32, such an ultimate finding "is 'a conclusion of law or at least a determination of a mixed question of law and fact. It is to be distinguished from findings of primary, evidentiary or circumstantial facts. It is subject to judicial review and, on such review, the court may substitute its judgment for that of the board.' Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 491, 57 S.Ct. 569, 573, 574, 81 L.Ed. 755; Helvering v. Rankin, 295 U.S. 123, 131, 55 S.Ct. 732, 736, 79 L.Ed. 1343. If the conclusion of the Board be regarded as a determination of a mixed question of law and fact, it has, as we shall presently show, no support in the primary and evidentiary facts. The ultimate determination, therefore, should be overturned, under the doctrine of Helvering v. Rankin, supra, as a matter of law." Therefore, we may determine whether the Tax Court reached the correct result on the basis of its findings.

The case of Nelson v. Commissioner, 1952, 19 T.C. 575, cited and relied on by the Tax Court in support of its conclusion is readily distinguishable from the

instant one on its facts. In this case, unlike Nelson, there is no evidence that taxpayer's advances bore any relation to his holdings in the company or that any of the stockholders made such advances. Nor is there anything in the record bearing upon the adequacy of the corporate capital already invested at the time of these advances. Further, in this case, the early minutes of the corporation referred to the advances as loans and, although book entries at one period recorded them as donated surplus, there was a correcting entry in 1933 specifically transferring the advances to a capital loans account.[8]

No conclusive weight attaches to the fact that no note or evidence of indebtedness was issued and that no interest was payable on these advances. Commissioner does rely heavily, however, on the fact that the sums involved were to be repaid only as earnings became available. Such a contingency, though it does indicate an inconsistency with the theory of a fixed obligation to repay and though it is one of the factors to be considered, does not, however, prove conclusive in the circumstances of this case which indicate that taxpayer had a reasonable expectation that he would be repaid. Cf. Gilbert v. Commissioner, supra. The case of Guardian Investment Corp. v. Phinney, 5 Cir., 1958, 253 F.2d 326, relied upon by commissioner held only that, because the liability of a company to pay interest and principal on a second mortgage note did not become a fixed and definite obligation during the taxable years there involved, there was no indebtedness within the meaning of the federal tax laws on which interest could be accrued and deducted. That is not this case.

We hold that the legal effect of the facts as found by the trial court indicate

8. In Nelson taxpayers contended that some $20,000 of a total investment of some $22,000 amounted to loans, a completely disproportionate debt-equity ratio. Further, repayment in Nelson was, by agreement, to be made proportionate

that the advances were loans and not contributions to capital. The taxpayer thus, on July 2, 1948, properly charged part of his existing debt against the capital stock loan account *as he had periodically done in prior years*. In view of our holdings on the two items in issue, taxpayer realized no income on the second transaction of July 2, 1948. His total debt of $95,561.52 was properly canceled in return for $64,300 worth of debentures, and in relinquishment by him of $11,000 in salary credits and the $20,851.76 owing him by the company, or a total of $96,151.76.

The decision of the Tax Court is affirmed except as to that part determining the sum of $20,851.76 to be a contribution to capital, as to which it is reversed, and this matter is remanded to the Tax Court for a redetermination of deficiencies consistent with this opinion.

to stockholdings and not to alleged "lenders" but to whoever held the stock at the time of distribution. All records of the company referred to the advances as paid-in surplus.