Hugh F. COLVIN and Audy Lou Colvin, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 995-58.

United States District Court
S. D. California,
Central Division.

Sept. 2, 1959.

878

Watkins, Lund & Peck, Los Angeles, Cal., for plaintiffs.

Laughlin E. Waters, U. S. Atty., Edward R. McHale, Asst. U. S. Atty., Los Angeles, Cal., for defendant.

HARRISON, District Judge.

This case wherein the taxpayer is seeking a refund on his taxes for the year 1955 was tried principally on an agreed statement of facts. However, the Government introduced certain evidence at the trial over the strenuous objection of plaintiffs. This evidence was admitted in the interest of justice in order that the court might have as complete a picture as possible. Whether the objection was well taken or not becomes moot in view of the conclusions of the court hereinafter stated.

The facts disclose Unitek Corporation was organized under California law in 1948 to manufacture and sell orthodontic and dental appliances and equipment.

Unitek's original capitalization consisted of the issuance of 350 shares of preferred stock, sold at par of $100 per share. In addition 550 shares of common stock were issued at $1 per share. For each share of preferred stock purchased a person was entitled to buy one share of common stock. Thus the holders of the 350 shares of preferred stock (28 persons, mostly dentists, held this preferred stock, the largest individual holding was 30 shares) also held 350 shares of the common stock. The additional 200 shares of common stock were issued to three officers of the corporation, who held no preferred stock, but who were contributing their services.

The Articles of Incorporation provided that all preferred stock be retired before any dividends could be declared on the common. In 1955 the Board of Directors voted to redeem 70 shares, or 20%, of the outstanding preferred stock. Redemption was by lot. Plaintiffs' five shares of preferred stock were redeemed. (Plaintiffs originally purchased 5 shares of preferred stock and 5 shares of common stock). Redemption was at par of $100, the same price at which plaintiffs and others had purchased the stock. At the time of redemption the corporation had sufficient earnings to have paid the $100 per share out of profits. Unitek treated the transaction as a reduction of its stated capital by the value of the shares redeemed ($7,000 at par). No earnings of Unitek had been capitalized at that time.

No further preferred stock was redeemed until 1959, when the remaining 80%, or 280 shares, of the preferred stock were redeemed, again at par. By this time most of the common stockholders, while keeping their common stock, had sold their preferred to an outside party, so that there was a split in the ownership between the common and preferred stock. (Most of the transferring of preferred stock had taken place in December, 1958, one month prior to the redemption.) Again Unitek treated this redemption as a reduction of its stated capital by an amount equal to the par value of these 280 shares of preferred

stock, or $28,000. Unitek, thus, started with a stated capital of $35,550 (350 shares of preferred, 550 shares of common) and through these redemptions reduced its stated capital by $35,000, leaving only $550.

Plaintiffs considered the redemption in 1955 as an exchange on which there was neither gain nor loss ($500 paid for 5 shares of preferred, $500 received on redemption). The Commissioner considered the redemption as "essentially equivalent to a dividend" and assessed a deficiency of $237.85, which plaintiffs paid and now seek in refund.

The issue presented is whether the redemption of preferred stock was a distribution in exchange for stock or was "essentially equivalent to a dividend".

Section 302, IRC (1954), 26 U.S.C.A. § 302, provides in part:

"(a) General rule.—If a corporation redeems its stock * * * and if paragraph (1) * * * of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

"(b) Redemptions treated as exchanges.—

"(1) Redemptions not equivalent to dividends.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend."

Section 1.302–2(a), Federal Income Tax Regulations, speaks of a redemption as "essentially equivalent to a dividend" when it has "the same effect as a distribution without any redemption of stock".

■ Whether a distribution in redemption of stock is essentially equivalent to a dividend "depends upon the facts and circumstances of each case". Federal Income Tax Regulations, § 1.302–2(b). It is a question for the trier of fact. Ortmayer v. Comm. Int. Rev., 7 Cir., 1959, 265 F.2d 848, 852.

Due to its fairly recent enactment there has been little litigation as yet involving § 302(b)(1), IRC 1954. However, § 115(g), IRC 1939, 26 U.S.C.A. § 115(g), was a comparable provision and has been the source of much litigation. These § 115(g) cases provide guidance.

The Ninth Circuit Court of Appeals in three recent cases arising under § 115(g), IRC 1939, namely, Earle v. Woodlaw, 1957, 245 F.2d 119, certiorari denied 354 U.S. 942, 77 S.Ct. 1400, 1 L.Ed.2d 1539; Phelps v. Com'r Int. Rev., 1957, 247 F.2d 156 and Pacific Vegetable Oil Corp. v. Com'r Int. Rev., 1957, 251 F.2d 682, set forth certain "judicial criteria" or factors to be used or weighed in determining whether the net result of a redemption is essentially equivalent to a dividend. As the Fifth Circuit Court of Appeals noted, however, "not all factors will be present in every case". United States v. Fewell, 1958, 255 F.2d 496, 501.

■ The "judicial criteria", or factors, to be considered, as set forth in Earle v. Woodlaw, supra [245 F.2d 126], are as follows:

"1. Did the corporation adopt any plan or policy of contradiction of its business activities?"

Unitek Corporation was actually expanding its business activities, but was reorganizing its capital structure as the Articles of Incorporation necessitated.

"2. Did the corporation follow an orderly procedure looking toward its ultimate dissolution, or its ultimate contracted operation?"

Neither this factor, nor the first factor, are factually involved in this Unitek redemption, as expansion, rather than contraction, was contemplated.

"3. Did the initiative for the corporate distribution come from the corporation, based on usual business considerations, or did it come from the stockholders, (or a stockholder), for their (or his) own purposes?"

Preferred stock was issued to raise the initial capital for Unitek Corporation. To encourage investors to buy the preferred stock the Articles of Incorporation provided that all preferred stock was to be redeemed and cancelled before any dividends could be paid on common stock. The redemption provision, thus, had a legitimate business purpose in facilitating the raising of initial capital. The

provision was intended to minimize the risk of preferred stockholders in investing in the newly formed corporation.

■■ While proof of a valid business purpose is not of itself adequate to establish that the distribution was not essentially equivalent to a dividend, Ortmayer v. Com'r Int. Rev., 7 Cir., 1958, 265 F.2d 848, 852, it is a factor to be considered. United States v. Fewell, 5 Cir., 1958, 255 F.2d 496, 500. See also Revenue Ruling 56–540. However, the "absence of a corporate purpose, and the presence of a plan benefiting only the shareholders, is highly persuasive" of a redemption being essentially equivalent to a dividend. Phelps v. Com'r Int. Rev., 9 Cir., 1957, 247 F.2d 156, 158.

"4. Is the proportionate ownership of stock by the shareholders changed?"

The redemption in 1955 affected only 20% of the preferred shareholders (including all of plaintiffs' preferred stock). At this point the proportionate ownership was changed. In 1959 when the remainder of the preferred stock was redeemed, much of the preferred stock had been sold and was no longer held by common stockholders. Thus viewing the redemption in the aggregate, its effect was also disproportionate. Revenue Ruling 56–540 takes the position that where preferred stock is redeemed for business purposes and where there was no proportional ownership of the two classes of stock, the transaction was not essentially equivalent to a dividend.

Each shareholder, because of the changes in ownership of stock, received a different amount in redemption than if a dividend on all common stock had been declared. See Northrup v. United States, 2 Cir., 1957, 240 F.2d 304 for a disproportionate distribution situation, similar to the case at bar.

Federal Income Tax Regulations, § 1.302–2(b), provides that "the redemption of all of one class of stock * * * either at one time or in a series of redemptions generally will be considered as a distribution under § 301 [that is as a dividend] if all classes of stock outstanding at the time of the redemption are held in the same proportion." As stated above, all classes were not held in the same proportion, either initially (officers had common stock, but no preferred) nor at the time of redemption (due to changes in ownership).

"5. What were the amounts, the frequency and the significance of dividends paid in the past?"

As noted, no common stock dividend could be paid under the Articles of Incorporation until the preferred stock had been retired. 5% per year preferred dividends had been paid.

"6. Does the capitalization, at the time of the cancellation of the stock, represent capital paid in, or earnings from the business?"

Although earnings were ample, no earnings had been capitalized. Thus the entire stated capital had been paid in by shareholders.

"7. Was there a sufficient accumulation of earned surplus to cover the distribution, or was it partly from capital?"

There was sufficient earned surplus, but see question 8.

"8. Was there a maintenance of a relatively similar amount of capital liability, or did that figure decrease to a degree somewhat comparable to the purported distribution of capital?"

When $7,000 of preferred stock was redeemed in 1955, stated capital was reduced by $7,000. When the remaining $28,000 of preferred stock was redeemed in 1959, stated capital was reduced by $28,000.

"9. Was there good faith, or bad, in the action of the Board of Directors?"

This test is no longer considered important.

"10. What was the *net effect* of actions taken?" (Emphasis added.)

The court said that "this last criteria is that of most importance." Earle v. Woodlaw, supra, 245 F.2d at page 126.

■ The "net effect" was the cancellation of plaintiffs' preferred stock at the same price plaintiffs had paid for them. It was a return capital to them. All earnings of the corporation remained with the corporation and would be sub-

ject to dividend taxation when distributed as dividends on the common stock. Corporate capitalization was reduced by the amount of the distribution. Distributions in redemption were not pro rata to all common stockholders.

To put this case bluntly, the owners of the preferred stock invested risk capital which they were to have refunded from the first earnings of the corporation. If they had made loans to the corporation, it would hardly be claimed that the repayment of the loans represented income. If repayment of this risk capital were taxed as income, I presume the next step would be that repayment of loans would be claimed to represent income. If the Government's position is correct, it will be difficult to finance new enterprises. In this case the Government will sooner or later collect its taxes on any transfer of the common stock. The basis for the transfer of the common stock will be $5 instead of $505. Why not wait. We will always have our national debt with us and the diligent tax collector will always be around.

Plaintiffs are entitled to judgment as prayed for. Counsel for plaintiffs is directed to prepare and submit proposed judgment and findings under our local rules.