**Paul COBB, Former District Director of Internal Revenue, Appellant,**

v.

**CALLAN COURT COMPANY, Appellee.**

**UNITED STATES of America, Appellant,**

v.

**W. H. CHAMBERS and Mrs. Rena C. Chambers, Appellees.**

**No. 17648.**

United States Court of Appeals
Fifth Circuit.

Jan. 29, 1960.

534

Grant W. Wiprud, Jerome S. Hertz, Harry Baum, Attys., Dept. of Justice, Washington, D. C., Charles D. Read, Jr., U. S. Atty., Atlanta, Ga., Lee A. Jackson, Atty., Dept. of Justice, Charles K. Rice, Asst. Atty. Gen., D. of J., Washington, D. C., Slaton Clemmons, Asst. U. S. Atty., Atlanta, Ga., for appellant.

M. E. Kilpatrick, Atlanta, Ga. (Smith, Kilpatrick, Cody, Rogers & McClatchey, Atlanta, Ga., of counsel), for appellees.

Before HUTCHESON, CAMERON and JONES, Circuit Judges.

JONES, Circuit Judge.

The controversies here presented arise out of the somewhat complex corporate history of the Atlanta Biltmore Hotel Company, herein usually called the Old Company, and its successor, the Atlanta Biltmore Hotel Corporation, which will be referred to as the New Company. The primary question in the case of Cobb v. Callan Court Company is whether distributions to Callan in 1950 from the New Company in redemption of its preferred stock were in partial liquidation and not subject to Federal income taxation as ordinary income to Callan as is provided by Section 115(c) of the Internal Revenue Code of 1939,[1] as was held by the district court, or as being essentially equivalent to the distribution of a taxable dividend under Section 115 (g) of the Internal Revenue Code of 1939,[2] and hence to be treated as ordinary income, as is contended by the Govern-

ment. If it be decided that the payments were not essentially equivalent to dividends, then a determination of Callan's cost basis of the redeemed stock becomes necessary. The Chambers case involves the character of the distributions received by Callan's stockholders of the funds paid to Callan by the New Company, and the decision will follow that of the Callan case.

The sequence of facts extends over a somewhat extended period. The factual transactions were considerable in number and not wholly free from complexity but, so far as is necessary for our purpose to state them, they may be summarized in reasonable compass. In 1921, William H. Candler, Sr., owned an entire block of real estate in the City of Atlanta, Georgia, upon which was situate an apartment building under construction. He organized Callan Court Company in April of that year and transferred to it the Atlanta real property, a block of stock, and his note payable to Callan in the amount of $5,843.43. For these transfers Candler received from Callan 10,000 shares of its common stock having a par value of $100 per share. 7,500 shares of the stock were issued to Candler and, at his request, 2,000 shares were issued to his wife, who is now Mrs. Bennie T. Hanson, 250 shares were issued to a trust for his son, William H. Candler, Jr., and the remaining 250 shares were issued to a trust for his daughter, Rena Candler, who is now Rena C. Chambers, an appellee in one of

[1] "Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. In the case of amounts distributed (whether before January 1, 1939, or on or after such date) in partial liquidation (other than a distribution to which the provisions of subsection (h) of this section are applicable) in part of such distribution which is properly chargeable to capital account shall not

be considered a distribution of earnings or profits. * * *" 26 U.S.C.A. (I.R.C. 1939) § 115(c).

[2] "If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend." 26 U.S.C.A. (I.R.C.1939) § 115(g).

the cases we here decide. In 1923 the Old Company, the Atlanta Biltmore Hotel Company, was organized and the Atlanta block was transferred to it by Callan. Callan received all of the original issue of common and preferred stock of the Old Company which it received at a cost basis of $2,000,000. The Old Company put out a $3,000,000 issue of bonds which were sold to the public. Candler guaranteed the payment of some of the bonds. The proceeds of the bond issue were used to complete the construction of the apartment and to erect the Atlanta Biltmore Hotel on the property. Candler advanced about $750,000 for acquiring furnishings for the hotel.

The Old Company, operating the hotel and apartment property, sustained substantial losses from the opening of the hotel and apartment house in April, 1924, until 1937. Candler, to keep the Old Company going, made advances to it and transferred its obligations thereby created to Callan as contributions to Callan's capital or for additional Callan stock. From time to time Callan bought in bonds which the Old Company had issued and ultimately it had purchased these bonds of the face value of $1,766,-800, for which it had paid $1,781,868. These bonds were surrendered and cremated during the two-year period between December, 1928, and December, 1930, in order to improve the credit standing and balance sheet of the Old Company, to eliminate the need for Callan to advance funds for payment of interest on these bonds which would come back to it as taxable income, and to relieve Candler, pro tanto, from his guaranty of the bonds. In 1927 Candler revamped the capital structure of the Old Company, halved the par value of the preferred stock held by Callan and moved its preferences behind a new First Preferred stock which Candler hoped to sell to the public. This recapitalization changed the par value of the common stock from $100 to $5 per share without increasing the number of shares outstanding. These maneuvers worked an improvement in Old Company's balance

sheet by reducing the par value of outstanding stock by a million dollars.

Candler was disappointed in his hopes of finding financing by the sale of the new First Preferred stock issue. He then planned to borrow from an insurance company funds for the retirement of the outstanding bonds and, to this end, he again changed the capitalization by eliminating the preferred stock issues. The Second Preferred and the common were exchanged for a new common stock which was then the only stock authorized. A mortgage commitment was procured and withdrawn. Callan purchased additional common stock. It made disposition of 425,000 shares of Old Company's common by surrendering a part to Old Company as a capital contribution and transferring the rest to Callan's stockholders in exchange for stock of Callan. In 1932 the Old Company defaulted in its mortgage bond obligations and the trustee for the bondholders instituted foreclosure proceedings in the Superior Court of Fulton County, Georgia. Candler and Callan intervened, asserting preference claims for advances made to the Old Company for the payment of taxes, bond interest and other items, and making a claim for a parity with bondholders for the amount of bonds which had been purchased and cremated. During the pendency of these proceedings the stockholders of the Old Company adopted a resolution reciting that the bonds of Callan in the amount of $1,766,800, which had been cremated, represented an unsatisfied obligation of the Old Company, and providing for their reissue. By the same resolution the Old Company recognized an obligation to Callan Court for its advances in the amount of $1,058,621.81 which were made and used for the purposes of paying taxes, bond interest, insurance and bond sinking fund. Callan tendered common stock of the Old Company as an incident to the reissue of the bonds. The bonds were reissued by the Old Company but the bond trustees declined to certify them and held them undelivered. The Superior Court de-

cided against Candler and Callan. On appeal, the Supreme Court of Georgia handed down an opinion affirming the Superior Court. Callan Court Co. v. Citizens & Southern National Bank, 184 Ga. 87, 190 S.E. 831. The state court judgment never became final or effective because of an intervening bankruptcy reorganization.

The Old Company filed a petition under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207,* and its reorganization was ultimately approved. The proceedings in the state court were stayed. Callan filed a claim as a preferred creditor in the amount of $3,000,000. A new corporation, Atlanta-Biltmore Hotel Corporation, herein called the New Company, was organized as the medium for the accomplishment of the reorganization. The original plan provided that bondholders other than Callan would be given new first mortgage bonds of the same amounts as those held, that Callan would receive second mortgage income bonds in the amount of $3,000,000, and the holders of the common stock of the Old Company would receive for each 100 shares held, one share of the common stock of the New Company. In order to improve the fiscal position of the New Company and reduce the amount of the fixed interest charge, an amended plan was adopted which gave Callan preferred stock instead of the second mortgage bonds. Callan had agreed with two law firms which represented it in the reorganization proceedings that each firm should receive ten per cent. of whatever securities Callan should be entitled to in the reorganization. In changing the plan so as to provide for preferred stock rather than second mortgage bonds the law firms were told by the Secretary of the New Company "That just as soon as our bonds were taken care of we would begin the retirement of the preferred stock. That is the same thing that we had in mind with the income bonds." The amended plan was approved and the New Company issued its securities.

The New Company, in its operations from June, 1937, through December, 1947, had an accumulated deficit of $240,279.11. During the next four years the after-tax income totaled $650,885.74 with an average of $162,721.43. In 1944 the New Company borrowed funds to pay off its then outstanding bonds and in 1948 it completed paying the obligation incurred in 1944. Callan owned 24,000 shares of the $100 par value preferred stock of the New Company. During the 1948–1951 period the New Company called and redeemed at par on the following dates stock in the following amounts:

| | | |
|---|---|---|
| December 31, 1948 | 1500 sh. | $150,000 |
| January 3, 1949 | 1500 | 150,000 |
| December 30, 1949 | 2000 | 200,000 |
| May 3, 1950 | 1000 | 100,000 |
| December 29, 1950 | 250 | 25,000 |
| December 29, 1951 | 250 | 25,000 |
| | 6,500 | $650,000 |

With funds received from the redemptions of December 31, 1948, and January 3, 1949, Callan purchased the outside holdings of the New Company's preferred stock. During this period the percentage of the common stock of the New Company owned by Callan ranged from 32% on December 31, 1948, to 48% on and after December 30, 1949. During the period the stock of Callan was owned, 50% by Mrs. Hanson, 25% by Mrs. Chambers, and 25% by William Can-

* Now 11 U.S.C.A. § 501 et seq.

dler, Jr. Callan, during the 1949–1951 period had substantially no assets other than its investments in the New Company. The District Director determined that the redemptions of preferred stock, made during 1950, were essentially equivalent to the distribution of taxable dividends and as such were subject to Federal income tax as ordinary income. Only the tax for the year 1950 is involved in this appeal. Callan paid the tax as assessed and sued the District Director for a refund. The district court held for Callan and the District Director has appealed.

 The approach to be made by a court in reaching a decision in a case such as this has been thus stated:

"This is that in law taxes are not regarded as benefits conferred, but as burdens imposed upon those subject to them, and they may not therefore be exacted except upon and in accordance with a fair construction of the taxing laws which it is claimed impose them.

"While, therefore, tax laws must be applied as written, and those subject to them may not escape their burdens, strained and artificial constructions in tax cases of law or of fact will be avoided, and words and acts will normally be given their usual and ordinary meaning." Davis v. Penfield, 5 Cir., 1953, 205 F.2d 798, 802.

Such is the approach we make here. The question we approach is whether the net effect of the transaction was a distribution of earnings and profits of the corporation essentially the same as if a cash dividend had been declared. This question is primarily a question of fact. United States v. Fewell, 5 Cir., 1958, 255 F.2d 496. The evidentiary facts, established by stipulation and uncontradicted testimony, are not in dispute. The Government and Callan draw different inferences from the facts and so we have set forth those which we regard as being essential to a decision. Each of the parties cites our opinion in the Fewell case. There we mentioned some of the factors that might, in particular cases, be considered in deciding whether a corporate distribution was essentially equivalent to a dividend. In that opinion it was said:

"Although no specific tests have been or can be stated, the decisions recognize certain criteria. Included are the following: The presence or absence of a bona fide corporate business purpose, whether the initiative for the distribution came from the corporation or from the participating stockholders, whether earnings and profits were available for dividends and the prior dividend history of the company, whether the transaction resulted in any substantial change in the ownership or control of the corporation, whether the transaction was the result of or resulted in a contraction of the corporation's business or narrowed its activities, whether the distribution was substantially pro rata among the stockholders, and whether the stock * * * was cancelled and retired or held as treasury stock." 255 F.2d 496, 500.

Callan attempts to show that it has met a number of the criteria set out in Fewell and calls attention to other matters as being factors in favor of its position. The Government lists a number of the Fewell criteria which it urges Callan has not met. In the Fewell opinion it was said and it may be emphasized that factors other than those enumerated in Fewell may be important, that not all of the factors will be present in a given case, and some factors may weigh more heavily than others. So too may a particular circumstance or group of circumstances bear more weight in one situation than in another. All relevant factors are to be considered. Ortmayer v. Commissioner, 7 Cir., 1959, 265 F.2d 848. The net effect of the distribution is the fundamental question. Commissioner of Internal Revenue v. Estate of Bedford, 325 U.S. 283, 65 S.Ct. 1157, 89 L.Ed. 1611; Flanagan v. Helvering, 1940, 73 App.D.C. 46, 116 F.2d 937. See

United States v. Fewell, supra, and cases therein cited.

The rights evidenced by the preferred stock had their origin in advances made to or for the benefit of the corporation. But for these advances it is unlikely that the corporate operations could have continued. The making of advances, the purchase of bonds, the cancellation of bonds, and the issuance of preferred stock rather than bonds in the bankruptcy reorganization were all beneficial to the corporation. Incident to the issuance of the preferred stock was the declared purpose of redeeming it. This purpose was a bona fide business purpose and, we think, no less so than that of the payment of the bonds issued as a part of the bankruptcy reorganization.

Prior to 1948 no earnings or profits were available to either the Old Company or the New Company for dividend payments. Prior to 1942 there were no profits. In the years 1942 through 1947 earnings were used, and properly used, for debt retirement. The use of earnings from 1948 through 1951 for preferred stock retirement which the corporation had, at the outset, contemplated retiring, cannot be regarded as improper or as exhibiting an intent to use the preferred stock redemption as a substitute for the payment of a cash dividend on the common stock.

It cannot be said that the preferred stock redemption was the result of or resulted in a contraction of the corporate business. It did delay the making of repairs and renovations, and the modernization of the corporation's property which had been postponed during the long period of operating losses.

The Government contends that because Callan and its stockholders held substantially all of the common stock of the New Company, the redemption of the preferred stock held by Callan was a ratable distribution. The stock of Callan was held, one-half by Mrs. Hanson, one-fourth by William Candler, Jr., and one-fourth by Mrs. Chambers. Callan owned, at the time of the stock redemption with which we are here concerned, 48%

of the common stock of the New Company. Mrs. Hanson owned 43% of the common stock and if she be credited with an indirect ownership of half of that held by Callan her interest would be 67%. Mr. Candler, Jr., had 3% plus of the New Company common and if there be added to it one-fourth of the Callan holding he would have to his credit 15% plus. The interest of Mrs. Chambers was the same. Mrs. Hanson benefited to the extent of 50% of the stock redemption as opposed to a 67% benefit which would have inured to her in the event of a cash dividend on the New Company's common stock. Where Mrs. Hanson benefited 17% less by the preferred redemption, Mrs. Chambers and Mr. Candler, Jr. each benefited by approximately 10% more. These differences are substantial. The distribution resulting from the preferred stock redemption was not substantially pro rata among the holders of the common stock. Ratable distribution among stockholders is an important element and is so regarded by the Internal Revenue Service. Rev.Rul. 57–533, C B 1957–2 p. 223.

The redeemed stock was cancelled and retired. A long period of time intervened between the issuance of the stock and its redemption. These factors, urged by Callan, are to be considered with others in reaching a decision.

In this case we find perhaps more of the factors, lending weight on one side or the other of the balance, than are present in most of such cases. For the most part the factors, both in numbers and importance, are on the side of Callan. The determination of the district court that the preferred stock redemption was not essentially equivalent to a taxable dividend is clearly not erroneous.

█ Since we have concluded that the preferred stock redemption was not essentially equivalent to the distribution of taxable dividends with the result that the gains realized by Callan would be taxed as capital gains, it becomes necessary to consider whether the cost basis to Callan, as found by the district court, is correct. Callan's tax returns report-

ed its cost of the preferred stock as $100 per share. The court found the cost basis to be $90.21 per share with a long-term capital gain of $9.79 per share. The Government contended in the district court and here contends that the preferred stock had a zero basis to Callan. The Government's theory is that Callan's participation in the bankruptcy reorganization consisted of two separate and distinct transactions. In one transaction, says the Government, Callan transferred or released its claims for three million dollars for the preferred stock. The Government states that there was no cost basis for the three million dollar claim and hence, it reasons, there was no cost basis for the preferred stock. The other reorganization transaction, under the Government's theory, was an exchange of common stock of the Old Company for common stock of the New Company, which would have resulted in the entire cost or basis of Callan's investment in the Old Company attaching to the common of the New Company as the cost basis to Callan. The district court took a different view. The district court treated the reorganization, so far as it related to Callan and its tax liability, as a single transaction into which Callan put its claims against the Old Company and the common stock of the Old Company held by it, and out of which it received the preferred stock and common stock of the New Company. The district court found that the preferred stock had a market value of between $10 and $20 a share and that the common stock of the New Company had no market value. The district court therefore assigned all of the basis of Callan's investment in the Old Company, which it found to be $2,706,399, to the preferred stock of the New Company resulting in the cost basis of $90.21 per share. We approve of the district court's determination. The position of the Government seems unrealistic.

■ Taxation, as has been many times said, is a practical matter. Farmers' Loan & Trust Co. v. State of Minnesota, 280 U.S. 204, 50 S.Ct. 98, 74 L.Ed.

371; Snead v. Jackson Securities & Investment Co., 5 Cir., 1935, 77 F.2d 19, certiorari denied 296 U.S. 599, 56 S.Ct. 115, 80 L.Ed. 424. Pertinent here is the following:

"In determining the incidence of taxation, we must look through form and search out the substance of a transaction. Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 333, 65 S.Ct. 707, 89 L.Ed. 981; Gregory v. Helvering, 293 U.S. 465, 470, 55 S.Ct. 266, 79 L.Ed. 596. This basic concept of tax law is particularly pertinent to cases involving a series of transactions designed and executed as parts of a unitary plan to achieve an intended result. Such plans will be viewed as a whole regardless of whether the effect of so doing is imposition of or relief from taxation. The series of closely related steps in such a plan are merely the means by which to carry out the plan and will not be separated." Kanawha Gas & Utilities Co. v. Commissioner, 5 Cir., 1954, 214 F.2d 685, 691. See Georgia Pacific Corporation v. United States, 5 Cir., 1959, 264 F.2d 161; Mertens Law of Federal Income Taxation 598 et seq. § 20.161.

The issuance of the preferred stock to Callan in the reorganization was an integral part of the plan. The investment of Callan in the Old Company, both stock and claims, became the basis of the securities received by it in the reorganization. The consideration of the allocation of this overall basis between the common and preferred stock received by Callan in the bankruptcy reorganization leads into a maze of conflicting precedents. But looking through form and to the substance of the transaction and to its true nature, we conclude that it was proper for the district court to make an allocation of the entire cost basis of Callan to the preferred stock distributed to it on the reorganization. The judgment of the district court in the Callan Court Company case is affirmed.

The funds received by Callan Court Company from the preferred stock redemption were distributed to Callan's stockholders. The Government contended that these distributions to Callan's stockholders were dividends paid from Callan's earnings and profits. The stockholders, including Mrs. Rena C. Chambers, claimed that the payments were distributions out of capital and, under 28 U.S.C.A. (I.R.C.1939) § 115(d), were not taxable. The district court held that the payments by Callan were taxable income of its stockholders to the extent only that the payments were from earnings or profits of Callan, which as has been stated, was $9.79 of each share of the hotel company stock redeemed. Our affirmance of the district court judgment as to Callan Court Company requires an affirmance of the judgment in the Rena C. Chambers case. This is so apparent that a discussion of principles seems unnecessary.

Both judgments are
Affirmed.