Maclin P. DAVIS and Edith U. Davis, Plaintiffs-Appellees,

v.

UNITED STATES of America, Defendant-Appellant.

No. 18487.

United States Court of Appeals
Sixth Circuit.

March 27, 1969.

1140

William A. Friedlander, Tax Div., Dept. of Justice, Washington, D. C., for appellant, Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks, Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., on the brief, Gilbert S. Merritt, Jr., U. S. Atty., Kent Sandidge, III, Asst. U. S. Atty., Nashville, Tenn., of counsel.

William Waller, Nashville, Tenn., for appellees, Robert G. McCullough, Nashville, Tenn., on the brief, Waller, Lansden, Dortch & Davis, Nashville, Tenn., of counsel.

Before O'SULLIVAN and CELEBREZZE, Circuit Judges, and McALLISTER, Senior Circuit Judge.

CELEBREZZE, Circuit Judge.

The Government appeals a judgment of the United States District Court for the Middle District of Tennessee granting Taxpayer's [1] claim for refund of federal income taxes. The cause was heard on motions for summary judgment filed by both parties. On denial of its motion for rehearing the Government perfected this appeal. The question before us is whether a corporate distribution to Taxpayer, in redemption of all his preferred stock in the Corporation, was essentially equivalent to a dividend under Section 302(b) (1) of the Internal Revenue Code of 1954.[2]

In 1945, Taxpayer and one Bradley organized the Tennessee Foundry & Machinery Company (hereinafter Corporation) to manufacture steel castings. In

---

1. Appellees filed a joint return. The designation "Taxpayer" throughout this opinion, however, shall refer to Maclin P. Davis.

2. "Sec. 302. Distributions in redemption of stock.

"(a) General rule.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph

(1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

"(b) Redemptions treated as exchanges.—

"(1) Redemptions not equivalent to dividends.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend."

exchange for equipment transferred to the Corporation, Bradley and Taxpayer each received fifty percent of its common stock. Prior to incorporation, Taxpayer had begun negotiations with the Reconstruction Finance Corporation (hereinafter RFC) for the purpose of obtaining a $95,000 loan to the Corporation. RFC agreed to make the loan on the condition that the incorporators provide the Corporation with additional working capital in the amount of $25,000. Bradley insisted on retaining his fifty percent of the voting power but was unwilling to invest any additional capital. In order to meet the demands of RFC, Taxpayer contributed the $25,000 in exchange for one hundred shares of six percent non-voting preferred stock with a par value of $25 per share. Taxpayer contended and the District Court found that the sole purpose of the transaction was to enable the Corporation to obtain the RFC loan and that the preferred stock was to be redeemed when the loan was repaid. Thus, on the date of incorporation the capital structure of the Corporation was as follows:

|  | Common—% | Preferred—% |
|---|---|---|
| Bradley | 500-50 | |
| Taxpayer | 250-25 | 1,000 – 100% |
| Taxpayer's Wife | 250-25 | |

In 1952, Taxpayer purchased Bradley's common stock and in 1959 he transferred 250 shares to his son and 250 shares to his daughter. The original loan agreement provided that so long as part of the RFC loan was outstanding, no dividends could be paid without obtaining the written consent of RFC. Such permission was granted in 1960 and semiannual dividends were paid beginning on October 5th of that year.

On June 1, 1963 the loan was paid off and on September 23, 1963 the Corporation voted to redeem Taxpayer's preferred stock. On October 1, 1963 this stock was redeemed for $25,000, the amount Taxpayer paid for it. On this date the capital structure of the Corporation, reflecting the prior purchase of Bradley's shares by Taxpayer, was as follows:

|  | Common—% | Preferred—% |
|---|---|---|
| Taxpayer | 250-25 | 1,000 |
| Wife | 250-25 | |
| Son | 250-25 | |
| Daughter | 250-25 | |

The Commissioner contended that the $25,000 was "essentially equivalent to a dividend" within the meaning of Section 302(b) (1) of the Code, hence taxable as ordinary income under Section 301 of the Code.[3] The District Court held to the contrary and granted Taxpayer's claim for refund. We affirm the judgment of the District Court.

Section 302 of the Code provides capital gains treatment to corporate distributions made in redemption of stock. The transaction is treated as a sale or exchange of a capital asset and gain is

3. Section 301(c) of the Code provides that gross income includes dividends. Section 316 of the Code defines a "dividend" generally as a distribution of property made by a corporation to its shareholders out of earnings and profits.

realized to the extent that the distribution exceeds a taxpayer's cost basis for the stock. Here, Taxpayer received back his cost basis for the stock so he had no gain. On the other hand, corporate distributions amounting to dividends are includable in their entirety in gross income and taxed at ordinary rates. Where the question is whether a particular corporate distribution is a redemption or dividend Section 302 provides several tests for determining the answer.[4] Since the Corporation was not liquidating its business and the stock redeemed was preferred stock with no voting rights, our inquiry is limited to Section 302(b) (1) which simply states the principle that a corporate distribution in exchange for stock is not a redemption if it is essentially equivalent to a dividend.[5]

■■■ We therefore look to the facts as found by the District Court to determine whether the distribution in issue was equivalent to a dividend. See Ballenger v. United States, 301 F.2d 192 (4th Cir. 1962). The standard contained in Section 302(b) (1) calls for a factual resolution of the question and has been so used by the courts and the Commissioner. Rheinstrom v. Conner, 125 F.2d 790 (6th Cir. 1942), cert. denied 317 U.S. 654, 63 S.Ct. 49, 87 L.Ed. 526; Cobb v. Callan Court Co., 274 F.2d 532 (5th Cir. 1960); Colvin v. United States, 175 F. Supp. 877 (S.D.Cal.1959); Treasury

Regulation 1.302–2(b). Our function on review is to determine whether the District Court applied the correct criteria to those facts. Ballenger, supra; but see Pacific Vegetable Oil Co. v. Commissioner of Internal Revenue, 251 F.2d 682 (9th Cir. 1957) (dividend equivalency is mixed question of fact and law).

■ The purpose of the various tests in Section 302(b) of the Code is to prevent tax avoidance, more specifically, to prevent corporations from bailing out earnings to shareholders at favorable capital gains rates. To bring some objectivity to Section 302(b)(1), the Courts have established some guidelines which when applied to the facts of each case are calculated to determine whether a particular corporate distribution is in fact a dividend. Under the "strict net effect" test, if the taxpayer ends up in the same position after the distribution as he would have occupied had a dividend been declared, the net effect of the transaction is held to be the payment of a dividend. See, e. g., Commissioner of Internal Revenue v. Estate of Bedford, 325 U.S. 283, 65 S.Ct. 1157, 89 L.Ed. 1611 (1945); Levin v. Commissioner of Internal Revenue, 385 F.2d 521 (2d Cir. 1967). Applying the strict net effect test in the way that the Government urges, in 1963, Taxpayer—because of the attribution rules of Section 318[6] of the Code—would be considered as owning all

---

4. Similar rules are contained throughout Code Sections 301–318 (distributions by corporations other than liquidating distributions) and Code Sections 331–346 (liquidating distributions.)

5. By contrast, Subsections (2), (3), and (4), of Section 302(b) contain objective tests for determining whether the distribution was a redemption. Subsection (2) provides that substantially disproportionate distributions with respect to the shareholder are to be treated as redemptions under Section 302(a). By a limitation contained in that subsection, however, the shareholder must after the distribution end up with less than 50% of the total combined voting power in the corporation. Subsection (3) provides that a shareholder's stock is considered to be redeemed under Section 302(a) when he

terminates his interest in the corporation. Subsection (4) deals with railroad corporations. This leaves for our consideration Subsection (1) of Section 302(b).

6. Section 318(a) (1) makes Taxpayer the constructive "owner" of the common stock owned by his spouse and children. Since his spouse and children each owned 25% of the remaining 75% of the common stock of the Corporation, Taxpayer winds up with 100% of the common stock. Section 318(a) is made applicable to Section 302 generally by Subsection (c) '(1), of Section 302. But whether the attribution rules apply specifically to Section 302 (b) (1) has caused some controversy. See, e. g., Comment, 47 Minn.Law Rev. 853, 867–70 (1963). The District Court held that they do apply to Section 302(b) (1). We agree to the extent that con-

of the common stock of the Corporation so the distribution to him in payment for his preferred stock was made pro rata on his common stock. The Government contends that a pro rata distribution by a corporation effecting no basic change in shareholder relationships is the hallmark of a dividend, therefore the payment to Taxpayer was "essentially equivalent to a dividend" and taxable as such. Himmel v. Commissioner of Internal Revenue, 338 F.2d 815 (2d Cir. 1964); Kerr v. Commissioner of Internal Revenue, 326 F.2d 225 (9th Cir. 1964) cert. denied 377 U.S. 963, 84 S.Ct. 1644, 12 L.Ed.2d 735.

The District Court, however, looked to the entire transaction and applied the "flexible net effect" test. Under this test, a business purpose for the redemption will temper the conclusiveness of a strict net effect result. See Keefe v. Cote, 213 F.2d 651 (1st Cir. 1954). The Court looked to the point in time when Taxpayer contributed the $25,000 and found that the Corporation had always intended to redeem Taxpayer's preferred stock when the loan was paid off. We are aware that use of "business purpose" to mollify the rigors of the strict net effect test has been criticized, see, e. g., Levin v. Commissioner of Internal Revenue, 385 F.2d 521 (2d Cir. 1967), even by the First Circuit which purports to follow it. Bradbury v. Commissioner of Internal Revenue, 298 F.2d 111 (1st Cir. 1962). Many courts, however, give it some weight. See United States v. Fewell, 255 F.2d 496 (5th Cir. 1958); Commissioner of Internal Revenue v. Berenbaum, 369 F.2d 337 (10th Cir. 1966); Phelps v. Commissioner of Internal Revenue, 247 F.2d 156 (9th Cir. 1957); Colvin v. United States, 175 F. Supp. 877 (S.D.Cal.1959); Estate of Golwynne, 26 T.C. 1209 (1956). In any event, the "strict net effect" test and the "flexible net effect" test complement each other in this respect: to the extent that the facts show a business purpose for the redemption there is an absence of the proscribed tax avoidance purpose to bail out dividends at favorable tax rates. See Ballenger v. United States, 301 F.2d 192, 198 (4th Cir. 1962).

■ The Government concedes that there would be no issue of dividend equivalency here had the Corporation redeemed Taxpayer's preferred stock while Bradley owned fifty percent of the Corporation's common stock. A redemption of any of Taxpayer's preferred stock at such time would not have been a pro rata distribution on the Corporation's common stock. Nevertheless, armed with the strict net effect test the Government contends that Taxpayer's subsequent acquisition by way of attribution under Section 318(a) of the Code of one hundred percent control of the Corporation converted the distribution to him in payment for his preferred stock into a dividend paid pro rata on the common stock. To expand upon the Government's argument, Taxpayer was precluded from withdrawing his $25,000 investment intact because his decision to buy out Bradley's interest and acquire control of the Corporation converted what would have been a straight stock redemption into a tax-avoidance scheme to bail out corporate earnings. We do not believe Congress intended that Section 302 of the Code should work such a harsh result especially since the primary purpose of capital gains treatment is to encourage individuals to risk capital for investment purposes. Although closely-held corporations call for close scrutiny under the tax law, we will not, under the facts and circumstances of this case, allow mechanical attribution rules to trans-

structive ownership of stock may be used as a factor to determine whether the distribution in question is in reality a dividend. See Treas.Reg. 1.302–2(b). But, like the flexibility given to the strict net effect test, there may be situations where it would be unrealistic to apply the attribution rules in strict fashion, for instance in cases of family estrangement. Levin v. Commissioner of Internal Revenue, 385 F.2d 521 (2d Cir. 1967); Himmel v. Commissioner of Internal Revenue, 338 F.2d 815 (2d Cir. 1964).

form a legitimate corporate transaction into a tax avoidance scheme.

A transaction involving Section 306 of the Code illustrates the converse situation. Under that Section, preferred stock or its equivalent is treated for income tax purposes as a cash dividend where the preferred stock was originally distributed as a stock dividend pro rata on outstanding common stock. Section 306(c) (1) (A) Internal Revenue Code of 1954. Under Section 305 of the Code stock dividends are not taxable. When Section 306 preferred stock is sold or redeemed, the payment for it is taxable at ordinary income rates unless the shareholder has at the same time terminated his interest in the corporation.[7] Before the enactment of Section 306, the use of the "preferred stock bail out" was a popular tax avoidance device and Section 306 was intended to eliminate it. Section 306 stock, however, does not lose its cash dividend character if the holder disposes of all or part of his common stock. Section 302(b) (3); cf. Himmel v. Commissioner of Internal Revenue, 338 F.2d 815 (2d Cir. 1964). Likewise, Taxpayer's preferred stock did not become a cash dividend coverup even if the attribution rules are applied from the date he bought Bradley's common stock.

The facts of this case demand that substance win over form and that the entire transaction control the tax effect of the stock redemption in issue. As the District Court stated:

> "The subsequent acquisition of Bradley's stock holdings by taxpayer, making the redemption distribution essentially pro rata because of the § 318(a) attribution rules, neither impairs the legitimacy of the purpose underlying the issuance of the preferred stock [to provide additional security required by RFC] nor alters the fact that the redemption was simply the final [contemplated] step taken in completion of this purpose."

 We conclude that the District Court was, under the facts and circumstances in this case, correct in holding that the redemption by the Corporation of Taxpayer's preferred stock was a distribution made in exchange for his stock and not a distribution that was "essentially equivalent" to a dividend.

Affirmed.

---

7. Section 306 adopts the termination criterion of Section 302(b) (3) of the Code. See footnote 5, supra.