J. B. MORRIS and Rosalind K. Avallone

v.

UNITED STATES of America.

Civ. A. No. CA 4–75–251.

United States District Court,
N. D. Texas,
Fort Worth Division.

Oct. 25, 1977.

---

Donald L. Wilson, Wilson, McGee & Craig, Fort Worth, Tex., for plaintiffs.

William W. Guild, Tax Div., Dept. of Justice, Dallas, Tex., William L. Johnson, Jr., Asst. U. S. Atty., Fort Worth, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

MAHON, District Judge.

## I. INTRODUCTION

There are now before the Court Defendant's motion for judgment on the pleadings (filed 9 January 1976) and Plaintiffs' motion for summary judgment (filed 23 January 1976). Plaintiffs have filed an affidavit support of their motion for summary judgment, which essentially affirms the facts set forth in their original complaint. Both parties have thoroughly briefed each motion.

These motions came on for hearing before the Court on 8 March 1976. At that hearing, counsel for both parties agreed that there is no real factual dispute in this case and argued their respective positions with regard to the legal issue involved.

The sole legal issue now before the Court is whether the redemption of preferred stock by M–P Enterprises, Inc., from Plaintiff J. B. Morris[1] in 1969 should be treated as a dividend for federal income tax purposes.

## II. FACTUAL BACKGROUND

As there is no real factual dispute in this case, the Court will here set forth the factual background of this cause of action based upon Plaintiffs' original complaint, Defendant's summary of facts, and Plaintiffs' affidavit in support of their motion for summary judgment.

M. P. Enterprises, Inc. [hereinafter "M–P"], was incorporated in the State of Mississippi in 1955, under the name of M–P Cottonfield Company of Mississippi, Inc. The name was subsequently changed for marketing and trade reasons. The principal stockholders at this time were Plaintiff and O. L. Pierce [hereinafter "Pierce"]. Plaintiff owned 50% of the corporation and Pierce, along with his mother, Mrs. Jessie Pierce, owned the remaining 50%.

M–P–T Company, Inc. [hereinafter "M–P–T"], was organized in 1958 to operate primarily as a trucking firm for M–P. The principal stockholders of M–P–T were Plaintiff and Pierce, each owning 50% of the common stock.

At that time, neither corporation had any preferred stock authorized or outstanding.

In June 1960, marital discord between Plaintiff and his first wife, Alma, resulted in a divorce. Plaintiff and the Pierces believed that Alma's continuation as a common stockholder would disrupt the orderly operation of the companies. To avoid this result, both companies amended their charters to authorize the issuance of non-voting preferred stock. Subsequently, a preferred stock dividend was declared to all stockholders in the same proportion as their common stock holdings in the corporation. This enabled Plaintiff to negotiate a property settlement incident to his divorce which provided that his ex-wife would receive all the non-voting preferred stock in exchange

1. As used herein, "Plaintiff" refers to J. B. Morris. Rosalind K. Avallone was the wife of J. B. Morris during 1969 and is a party to this action only because she filed a joint income tax return with J. B. Morris for 1969.

for her interest in the common stock of M–P and M–P–T. This preferred stock, although non-voting, was entitled to dividends and, under state law, to vote for the purposes of liquidations or reorganizations. After the property settlement incident to Plaintiff's divorce, the stock ownership of the two companies was as follows:

| | M–P | | M–P–T | |
| STOCKHOLDERS | COMMON | PREFERRED | COMMON | PREFERRED |
| --- | --- | --- | --- | --- |
| O. L. Pierce | 2700 (50%) | 3632 (50%) | 160 (50%) | 550 (50%) |
| Jessie Pierce | 200 | 316 | 0 | 0 |
| J. B. Morris | 2900 (50%) | 0 | 160 (50%) | 0 |
| Alma Morris | 0 | 3948 (50%) | 0 | 550 (50%). |

Subsequent to the above transaction, the management became aware that even non-voting preferred stockholders could influence future reorganizational plans that the companies might have. Under state law, any plan of reorganization would have to be approved by at least two-thirds of the outstanding shares of each class of stock, whether or not such stock had voting rights under the provisions of the articles of incorporation. Thus, Plaintiff's ex-wife could block any plan of reorganization, since she owned 50% of the preferred stock of both corporations.

Because of these problems, and in anticipation of merging the two companies and going public with the stock, in July 1967, the companies decided to sell and Plaintiff decided to purchase preferred stock in the two companies for a cash par value price of $10 per share. In 1967, Plaintiff purchased 1786 shares of preferred stock from M–P and 560 shares of preferred stock from M–P–T. In 1968, Plaintiff purchased an additional 2800 shares of preferred stock from M–P. Since all of this stock was purchased for $10 per share, Plaintiff expended a total sum of $51,460 in acquiring preferred stock in M–P and M–P–T in 1967 and 1968. These purchases gave Plaintiff and the Pierces the necessary two-thirds ownership of the outstanding preferred stock necessary to effect a merger of the two companies. The stock ownership in the two companies after Plaintiffs' purchases in 1967 and 1968 was as follows:

| | M–P | | M–P–T | |
| STOCKHOLDERS | COMMON | PREFERRED | COMMON | PREFERRED |
| --- | --- | --- | --- | --- |
| O. L. Pierce | 2700 (50%) | 3632 (32%) | 160 (50%) | 550 (33%) |
| Jessie Pierce | 200 | 316 | 0 | 0 |
| J. B. Morris | 2900 (50%) | 4586 (35%) | 160 (50%) | 560 (34%) |
| Alma Morris | 0 | 4264 [2] (33%) | 0 | 550 (33%). |

Thereafter, the companies consulted with several financial specialists concerning the possibilities of these corporations going public, together with other financial recommendations. The corporations were also made aware that any preferred stock outstanding in the hands of an unfriendly shareholder would threaten future corporate plans.

In 1969, a special meeting of the common and preferred stockholders of M–P was held in order to adopt a plan of merger. Pursuant to the adopted plan of merger, M–P–T was merged into M–P, which became the

2. This figure reflects 316 shares of preferred stock that Alma Morris received in an equipment transaction.

surviving corporation. As a part of the approved plan of merger, all preferred stock issued and outstanding in the constituent corporations was to be redeemed and canceled. The management considered this redemption as a necessary step in the plan of merger as it removed an unfriendly stockholder who could disrupt future corporate activities.

Pursuant to the approved plan of merger, Plaintiff surrendered all of the preferred stock he had acquired in 1967 and 1968 at the same price for which he had purchased it, $10 per share, and received the exact amount he had previously paid, $51,460.

After the merger and redemption, Plaintiff and the Pierces each owned 50% of the common stock of M–P.

Plaintiff treated the redemption as full payment and exchange for his preferred stock. That is, as a sale of a capital asset, upon which no profit was made. Upon audit of Plaintiff's 1969 income tax return, however, the Commissioner determined that the payments Plaintiff received for his preferred stock were essentially equivalent to a dividend and, therefore, that the amount received was taxable as ordinary income. An assessment was made against Plaintiff, the assessment was paid, Plaintiff filed a claim for refund which was denied, and subsequently properly instituted this action for recovery of income taxes allegedly unlawfully assessed.

## III. DISCUSSION

The income tax treatment of stock redemptions is governed by I.R.C. (26 U.S.C.) § 302. Under this provision, a redemption of stock by a corporation is treated as a sale or exchange of a capital asset, and gained and realized, to the extent that the distribution exceeds a taxpayer's cost basis for the stock. On the other hand, if a corporate distribution has the same affect as a dividend on common stock, then the entire amount of the distribution is includable in a taxpayer's gross income and is taxed at ordinary rates.

There are four categories of corporate distributions which will qualify as a sale or exchange under § 302. The applicable category in this case is § 302(b)(1), which provides that redemption will be treated as a sale or exchange, if it is "not essentially equivalent to a dividend." In order to determine whether a distribution falls within this category, the courts have used several different tests. Generally, it is a question of fact, and all the circumstances surrounding the redemption should be considered.

The Court agrees with the Defendant that the controlling case in the present action is *United States v. Davis*, 397 U.S. 301, 90 S.Ct. 1041, 25 L.Ed.2d 323 (1970), in which the Supreme Court resolved the recurring tax question involving stock redemptions by closely held corporations. In *Davis*, the taxpayer owned 25% of the common stock of the redeeming corporation, with the remaining 75% owned by his wife, son, and daughter in equal amounts. Taxpayer also owned the only outstanding preferred stock, 1,000 shares with a par value of $25 per share, which he had purchased for $25,000 soon after the corporation was organized in 1945, in order that the corporation might qualify for a Reconstruction Finance Corporation loan, which it needed for working capital. It was understood that the corporation would redeem the preferred stock when the RFC loan was repaid. In 1963, after the loan had been repaid, and in accordance with the original understanding, the corporation redeemed the preferred stock. Taxpayer did not report as income the $25,000 which he received on the redemption. The Commissioner took the position that the $25,000 was taxable income. The Court of Appeals agreed with the taxpayer (408 F.2d 1139 (C.A.6, 1969)), holding "that the $25,000 received by taxpayer was 'not essentially equivalent to a dividend' within the meaning of that phrase in § 302(b)(1) of the Code because the redemption was the final step in a course of action that had a legitimate business (as opposed to a tax avoidance) purpose." After reviewing the legislative history of § 302(b)(1), the Supreme Court stated:

The intended scope of § 301(b)(1) as revealed by this legislative history is cer-

tainly not free from doubt. However, we agree with the Government that by making the sole inquiry relevant for the future the narrow one whether the redemption could be characterized as a sale, Congress was apparently rejecting past court decisions that had also considered factors indicating the presence or absence of a tax-avoidance motive.

\* \* \* \* \* \*

. . . If a corporation distributes property as a simple dividend, the effect is to transfer the property from the company to its shareholders without a change in the relative economic interests or rights of the stockholders. Where a redemption has that same effect, it cannot be said to have satisfied the "not essentially equivalent to a dividend" requirement of § 302(b)(1). Rather, to qualify for preferred treatment under that section, a redemption must result in a meaningful reduction of the shareholder's proportionate interest in the corporation. Clearly, taxpayer here, who (after application of the attribution rules) was the sole shareholder of the corporation both before and after the redemption, did not qualify under this test.

397 U.S. at 311 & 313, 90 S.Ct. at 1047–1048.

Plaintiff would have this Court distinguish the *Davis* case as only applying to those situations in which the taxpayer has sole ownership of all of the common stock of a corporation. The Court is of the opinion that such a distinction is unjustified and unsupported by both the language and the reasoning of the Supreme Court in *Davis*. Moreover, this Court agrees with Defendant that the holding in *Davis* clearly rejects any consideration of legitimate business purpose. The *Davis* decision requires the courts to ignore the reasons for which purchase or issuance of stock was made, and to look instead only to the redemption of the stock and the effect that redemption has on the taxpayer and the corporation. The relevant question under *Davis* is whether the effect of the redemption is to transfer property from the corporation to its shareholders without a change in the relative eco-

nomic interests or rights of the shareholders. To qualify for preferred treatment under § 302(b)(1), a redemption must result in a "meaningful reduction" of the shareholder's proportionate interest in the corporation.

Traditionally, the courts have recognized three types of economic interest in a corporation: (1) voting rights; (2) the right to share in corporate earnings; and (3) the ownership of a share of the corporate assets. *Himmel v. Commissioner of Internal Revenue*, 338 F.2d 815 (2d Cir. 1964).

Prior to *Davis*, the federal courts had used a "net effect" test, which was applied differently by different circuits. The leading case in the Fifth Circuit prior to *Davis* was *Cobb v. Callan Court Co.*, 274 F.2d 532 (5th Cir. 1960). Since the Fifth Circuit's analysis in *Cobb* was similar to the Sixth Circuit's analysis in *Davis*, the Supreme Court's holding in *Davis* must be seen as limiting the application of *Cobb*. Thus, valid business purposes are irrelevant.

One aspect of the *Cobb* decision, which was not directly dealt with in the *Davis* opinion, however, is the question of pro rata redemption or distribution. Plaintiff argues that *Davis* dealt only with situations wherein a redemption of preferred stock was in the same proportion as the ownership of common stock, since the taxpayer in *Davis*, by attribution owned 100% of the common stock.

This Court is of the opinion that the earlier pro rata distribution test must fall in light of the Supreme Court's logic in *Davis*. The determination of whether a redemption or distribution is proportional to the ownership of common stock is a method of measuring the equivalency of a redemption or distribution to a dividend that takes into account disproportionality in both directions of the particular redemption or distribution in question. In *Davis*, the Supreme Court emphasized that the redemption must result in a "meaningful *reduction* of the shareholder's *proportionate interest* in the corporation.*" Thus, the "meaningful reduction" test set forth in *Davis* is much narrower than the earlier "pro rata distri-

bution" test, and the "pro rata distribution" test has continuing validity only within the narrow confines of the *Davis* rationale.

In the present case, it is patent that Plaintiff has lost no voting control over the corporate activities. As a practical matter, his voting control remains exactly the same as before the redemption, even taking into account the right of preferred stockholders to vote on various types of reorganization, since both before and after the redemption Plaintiff and the Pierces could effect any action that they agreed upon, and could each stalemate any action that they did not agree upon.

Similarly, the Court finds that there has been no significant change in the proportionate ownership of the corporate assets.

The only remaining economic interest to consider is Plaintiff's right to share in the corporate earnings. Defendant urges that Plaintiff now has an increased share in the corporate earnings, by virtue of owning 50% of all of the outstanding stock (which is now entirely common), instead of merely owning 50% of the common stock and 35% of the preferred stock as he did before the redemption.

The Court, however, is of the opinion that Plaintiff has sustained a meaningful reduction of his proportionate interest in the right to share in corporate earnings. In this regard, the Court notes that Plaintiff only owns 50% of the common stock in the surviving corporation. He can only declare a dividend so as to share in the corporate earnings if both he and the Pierces agree. Prior to the surrender of his preferred stock, however, under the particular articles of incorporation involved herein, he was entitled to a yearly dividend of 5% of the par value of the stock ($10) whenever profits permitted. As preferred stockholder, he was entitled to dividends even before the officers of the corporation and the management had been paid their salaries. In light of the facts that Plaintiff does not now control the surviving corporation and that Plaintiff had previously owned preferred stock worth $51,460 in par value which would have yielded $2573 per year in divi-

dends, the Court concludes that Plaintiff's reduction in his economic interest in sharing in the corporate earnings is "meaningful."

Accordingly, the Court concludes that Plaintiff has sustained a meaningful reduction of his proportionate interest in the corporation and that the redemption here in question satisfies the "not essentially equivalent to a dividend" requirement of § 302(b)(1).

## IV. ORDER

In accordance with its discussion in this Memorandum Opinion, the Court ORDERS that Defendant's motion for judgment on the pleadings be hereby denied and that Plaintiffs' motion for summary judgment be hereby granted. Since the exact amount of taxes recoverable by Plaintiff from this controversy has not been stipulated before the Court, the Court hereby ORDERS Plaintiff to draft a proposed judgment in accordance with this Memorandum Opinion and Order and submit the same to counsel for Defendant for his approval as to form and amount recoverable.