Zelie Berenbaum and Harriet Berenbaum, et al. [1] v. Commissioner. Berenbaum v. Commissioner
Docket Nos. 700-63, 715-63, 716-63, 717-63. 5-147.
United States Tax Court
T.C. Memo 1965-147; 1965 Tax Ct. Memo LEXIS 181; 24 T.C.M. (CCH) 758; T.C.M. (RIA) 65147; May 27, 1965
*181 Held, on the facts, the redemption in 1959 by National Real Estate and Management Company of 40 shares of its preferred stock from Diamond Investment Company, a partnership composed of petitioners, was the essential equivalent of the distribution to Diamond Investment Company of a taxable dividend. Held, further, on the facts, the redemption in 1960 by National Real Estate and Management Company of 100 shares of its preferred stock from petitioner Zelie Berenbaum did not result in the distribution to him of a taxable dividend. Joseph Berenbaum, 340 Clermont St., Denver, Colo., for the petitioners. Leo K. O'Brien, for the respondent. DAWSON
Memorandum Opinion DAWSON, Judge: Respondent determined deficiencies in the income tax of petitioners for the taxable years and in the amounts set forth below: Docket
Taxable
Petitioners
No.
year
Deficiency
Zelle and Harriet
700-63
1959
$ 184.99
Berenbaum
1960
2,793.92
Joe and Penelope
Berenbaum
715-63
1959
165.88
Harry O. and Dona
Berenbaum
716-63
1959
$ 41.82
Mandel and Agnes
Berenbaum
717-63
1959
135.66 The sole issue presented in these consolidated proceedings is whether the redemptions by National Real Estate and Management Company of part of its preferred stock during *182 the years 1959 and 1960 were essentially equivalent to dividends within the purview of section 302(b)(1) of the Internal Revenue Code of 1954. All of the facts have been stipulated by the parties. Their stipulation, together with attached exhibits, is incorporated herein by this reference. Petitioners [2] are individuals residing in Denver, Colorado. Their Federal income tax returns for the years in question were filed with the district director of internal revenue at Denver, Colorado. Diamond Investment Company is a family partnership owned 50 percent by Harry O. Berenbaum, and 16 2/3 percent each by his three sons Zelie, Mandel, and Joe Berenbaum. The principal business activity of Diamond Investment Company during the years here involved was the management of investments. National Real Estate and Management Company (hereinafter referred to as National) is a corporation organized and existing under the laws of the State of Colorado. Its original capitalization was limited to 100 shares of common stock having no par value and *183 490 shares of non-voting six percent cumulative preferred stock having a par value of $100 per share. Subsequent to May 9, 1950, and during the period pertinent hereto, all of National's common stock was owned by Zelie (80 shares), Mandel (10 shares), and Joe (10 shares) Berenbaum. Prior to March 1, 1956, none of National's authorized preferred stock had ever been issued. Early in 1956 the management of National entered into negotiations with the Federal Housing Administration (hereinafter referred to as the FHA) with a view to securing approval of National as an FHA mortgagee. One of the requirements set by the FHA as a prerequisite for the approval of a nonsupervised company like National was that such company have sound capital funds or a net worth of not less than $100,000. Immediately prior to March 1, 1956, National was approximately $62,000 short of this minimum requirement due, in part, to amounts carried on its books as Advances Payable to Officers and as Notes Payable to Diamond Investment Company. On March 1, 1956, the Board of Directors of National, in pursuance of a plan for qualifying the corporation as an FHA mortgagee, voted to increase its authorized shares of $100 *184 par value preferred stock from 490 to 980 shares. The minutes of the directors' meeting stated that: The change was being made so that the company would have a minimum $100,000.00 capitalization which was necessary to meet government regulations for an approved mortgage company. It was also agreed that said preferred stock would be redeemed at the option of the company when the capitalization of the company was over $100,000.00 without taking into consideration the preferred stock. That same day National issued a total of 620 of its preferred shares of which 425 went to Zelie Berenbaum and 195 to Diamond Investment Company. Between March 1, 1956, and May 31, 1956, these shares were paid for by the recipients in the following manner: Cancellation of National's Advances Pay-
able to Officers
$26,388
Cash contributed by Zelie Berenbaum
15,912
Cancellation of National's Notes Payable
to Diamond Investment
12,000
Trust Deed contributed by Diamond
Investment Company
7,700
Total
$62,000 On June 6, 1956, National, having conformed with all FHA requirements, was authorized by that agency to conduct business as an approved mortgagee. Thereafter, sometime early in 1957, National's net worth dropped below *185 the $100,000 FHA required minimum and it was deemed necessary for the company to sell additional shares of its preferred stock in order to increase its net worth. On May 7, 1957, 70 of such additional shares were purchased by Zelie Berenbaum and 40 by Diamond Investment Company for $7,000 and $4,000, respectively. By January of 1959 National's net worth, including the value of its preferred stock, was $127,691.91. In November of that year, National redeemed 40 shares of its preferred stock from Diamond Investment Company for $4,000. In January of 1960 National's net worth, including the value of its preferred shares, was $139,339.72. On January 15, 1960, National redeemed 100 of its preferred shares from Zelie Berenbaum for $10,000. Neither the Diamond Investment Company partnership nor any of its individual partners reflected on their 1959 Federal income tax returns the receipt of the $4,000 from the redemption of National's preferred stock; nor, on his 1960 joint Federal income tax return did Zelie Berenbaum report the receipt of $10,000 from the redemption of 100 shares of National's preferred stock. Respondent has determined that the 1959 and 1960 redemptions of National's stock *186 resulted in the distribution to the partnership and to Zelie Berenbaum of a taxable dividend. Petitioners have taken the position that neither of the controverted redemptions was the essential equivalent of a dividend distribution. While petitioners concede the issue as framed to be one of fact, it is their contention that the stipulated facts of this case place the redemptions in question squarely within the rationale of such cases as Keefe v. Cote, 213 F. 2d 651 (C.A. 1, 1954), Estate of Henry A. Golwynne, 26 T.C. 1209 (1956), G. E. Nicholson, 17 T.C. 1399 (1952), and Cobb v. Callan Court Company, 274 F. 2d 532 (C.A. 5, 1960), in each of which it was held that the redemption under scrutiny was not essentially equivalent to a dividend. We do not agree. In our view the rule to be gleaned from these cases is that where, for the purpose of improving the credit position of a corporation, a bona fide corporate indebtedness to a stockholder is capitalized by means of the issuance of preferred stock - and a concomitant agreement is entered into providing for the redemption of such stock when the corporation is financially able to do so - then the later redemption of the preferred stock *187 will not be treated as being essentially equivalent to a dividend. As will readily be apparent from a reading of the cited cases, central to the decision in each is that the issuance of the preferred stock was merely the substitution of an equity instrument in form to evidence what in reality was a pre-existing bona fide corporate debt. The ratio decidendi of these cases seems to have had its genesis in the assumption that, in the absence of thin capitalization, preferred stock which is issued to evidence debt becomes in effect temporary capital, and that therefore the redemption of such preferred stock should have no different consequences than the generally tax free repayment of temporary capital which has remained debt in form as well as in substance. [3]
However, in the instant case petitioners have failed on this fully stipulated record to convince us that the advances made by Zelie Berenbaum and Diamond Investment Company either before or after March 1, 1956, constituted bona fide debts of National. Although the very point *188 was placed in issue by the pleadings, no evidence has been brought to our attention which would remotely support a finding in favor of petitioner on this controverted question of fact. Prior to March 1, 1956, a total of $38,388 was carried on National's books either as Advances Payable to Officers or Notes Payable to Diamond Investment Company. At the same time the total investment in National's capital stock was only $973. Petitioners have neither proved the nature of National's alleged indebtedness, whether any interest was paid upon it, or whether there was any reasonable expectation of repayment on the part of the alleged lenders. Subsequent to March 1, 1956, the $38,388 was capitalized by means of the issuance to Zelie Berenbaum and Diamond Investment Company of preferred stock. In order to further increase National's net worth to $100,000 and to maintain it at that figure, both Zelie Berenbaum and Diamond Investment Company, between March 1, 1956, and May 7, 1957, furnished the corporation with advances of money and property aggregating $34,612 in exchange for which they received preferred stock. It is conceded that without these advances National would neither have been able *189 to qualify nor to function as an FHA mortgagee. Aside from the minutes of the Board of Directors' meeting of March 1, 1956, indicating that National had an option to redeem its preferred stock "when the capitalization of the company was over $100,000.00 without taking into consideration the preferred stock," there is not a shred of evidence to show that National was under any obligation to repay the advances. Furthermore, at no time during the period they were outstanding were any dividends paid upon the preferred stock. On balance, therefore, we are of the view that National's preferred stock was issued to evidence an equity investment rather than a debt. Thus this case clearly does not fall within the rationale of the authorities urged by petitioners. The question of dividend equivalence has been before the courts many times with the consequent result that a number of objective criteria have been formulated for resolving this often perplexing issue of fact. [4] *191 While primarily the problem has devolved into one of applying the appropriate criteria, it must be borne in mind that the relevance of each depends largely upon the particular capital structure-distribution pattern under scrutiny. *190 Since, however, the very essence of a true dividend is a pro rata distribution of earnings and profits which works no change in basic shareholder relationships, the most important inquiry to be made is whether the transaction involved has resulted in any substantial change in the proportionate ownership of stock held by the shareholders. Bradbury v. Commissioner, 298 F. 2d 111 (C.A. 1, 1962), affirming a Memorandum Opinion of this Court; Ferro v. Commissioner, 242 F. 2d 838 (C.A. 3, 1957); Flannagan v. Helvering, 116 F. 2d 937 (C.A. D.C., 1940). In this connection it is to be noted that ownership of stock can involve three important rights, viz., to vote, to participate in current earnings and accumulated surplus, and to share in net assets on liquidation. While ownership of common stock normally involves all of these, ownership of preferred generally involves, to limited extents, only the latter two. In the case of a corporation having but a single class of stock, existence of a pro rata distribution may be determined simply by comparing the patterns of distribution in order to ascertain whether the shareholders received the same amount as they would have received had the total distribution been a dividend on the common stock outstanding. Moreover, a pro rata distribution in the case of a single class capital structure would also indicate the extent to which, if any, the basic rights to ownership have been affected since, where there is only common, those rights would exist in proportion to the shares held. However, a totally *192 different problem arises when a corporation has more than one class of stock. As a rule, the additional class will be a preferred. Since typically such shares have no voting rights, but have preferential though limited rights to participate in earnings and upon liquidation, redemption of some preferred may consequently cause different changes in a shareholder's total rights than would redemption of common. This is a fortiori when the preferred and common are not held in the same proportions by the same shareholders. Such is the case here. The following schedule illustrates, in terms of percentages, a comparison between the effect of a hypothetical dividend distribution on National's common stock and the effect of the actual distributions in redemption which occurred, each redemption being considered separately: Common
Preferred
Stockholder
No. of shares
Percentage
No. of shares
Percentage
owned
(of 100)
owned
(of 730)
actual
80
actual
495
constructive *
3.3
constructive *
39.1
Prior to 1st
redemption: Zelie Berenbaum
total
83.3
83.3
total
534.1
73.1
actual
0
actual
235
constructive *
100
constructive *
495
Diamond Investment
Company
partnership
total
100
100
total
730
100
(of 690)
actual
80
actual
495
constructive *
3.3
constructive *
32.5
Following 1st
redemption: Zelie Berenbaum
total
83.3
83.3
total
527.5
76
actual
0
actual
195
constructive *
100
constructive *
495
Diamond Investment
Company
partnership
total
100
100
total
690
100
(of 590)
actual
80
actual
395
constructive *
3.3
constructive *
32.5
Following 2nd
redemption: Zelie Berenbaum
total
83.3
83.3
total
427.5
72.3
actual
0
actual
195
constructive *
100
constructive *
395
Diamond Investment
Company
partnership
total
100
100
total
590
100
*193 As can be seen, prior to the first redemption (that of 40 shares owned by Diamond Investment Company partnership) the partnership actually and constructively owned 100 percent of National's common stock, thus constructively entitling it to 100 percent of any dividend declared upon such common stock. It also actually and constructively owned 100 percent of National's preferred stock. Immediately after the first redemption the partnership continued to own, actually and constructively, 100 percent of National's preferred stock and it actually received 100 percent of the proceeds of the redemption, the same percentage it would have been deemed to have received had a dividend been declared on the common. Thus, as to the partnership, the first redemption was not only pro rata, but also resulted in no change in its position vis-a-vis the complex of shareholder rights represented by National's preferred shares. It is our decision, therefore, that this first redemption resulted in the distribution to the partnership of the essential equivalent of a dividend. We are constrained, however, to reach a different conclusion with respect to the second redemption, *194 that of 100 shares from Zelie Berenbaum. Immediately prior to the redemption Zelie owned, actually and constructively, 83.3 percent of National's common stock and thus would have been entitled presumptively to 83.3 percent of any dividend declared on the common; yet he received only 76 percent of the proceeds of the second redemption, a difference which we think significant. Furthermore as can also be seen, while prior to the second redemption Zelie owned actually and constructively 76 percent of National's preferred shares, immediately thereafter his interest was reduced to 72.3 percent. Therefore, it cannot be said that, as to Zelie, the second redemption was either pro rata or resulted in no change in his rights of ownership as reflected by the preferred stock. Accordingly, we hold that the redemption of Zelie's 100 preferred shares did not result in the distribution to him of a taxable dividend. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Joe and Penelope Berenbaum, Docket No. 715-63; Harry O. and Dona Berenbaum, Docket No. 716-63; and Mandel and Agnes Berenbaum, Docket No. 717-63.↩
2. As used in this opinion, the term "petitioners" refers only to the male petitioners, and not to the wives of any of them unless otherwise specifically stated.↩
3. For a more detailed discussion of this point see Mickey and Holden, Distributions Essentially Equivalent to a Dividend, 43 North Carolina Law Rev. 32 (1964)↩.
4. Under section 115(g) of the 1939 Code we stated that: Among these criteria are: The presence or absence of a bona fide corporate business purpose; whether the action was initiated by the corporation or by the shareholders; did the corporation adopt any plan or policy of contraction, or did the transaction result in a contraction of the corporation's business; did the corporation continue to operate at a profit; whether the transaction resulted in any substantial change in the proportionate ownership of stock held by the shareholders; what were the amounts, frequency, and significance of dividends paid in the past; was there a sufficient accumulation of earned surplus to cover the distribution, or was it partly from capital. Genevra Heman, 32 T.C. 479, 487 (1959), affd. sub nom. Heman v. Commissioner, 283 F. 2d 227↩ (C.A. 8, 1960).
*. Sec. 318(a)(2)(A), I.R.C. of 1954↩.